**UNITED STATES of America**

v.

**Edward George BOOZ, Appellant.**

**No. 71–1280.**

United States Court of Appeals, Third Circuit.

Argued Sept. 28, 1971.

Decided Nov. 17, 1971.

Monroe L. Inker, Crane, Inker & Oteri, Boston, Mass. (Charlotte Anne Perretta, Boston, Mass., on the brief), for appellant.

John F. Penrose, Asst. U. S. Atty., Philadelphia, Pa. (Louis C. Bechtle, U. S. Atty., on the brief), for appellee.

Before SEITZ, Chief Judge, HASTIE, Circuit Judge and HERMAN, District Judge.

## OPINION OF THE COURT

SEITZ, Chief Judge.

At around 8:30 a. m. on April 18, 1967, two armed men robbed the Dublin, Pennsylvania branch of the Bucks County Bank & Trust Company of $8,950.75. The appellant is alleged by the government to be one of the robbers; no other suspect has been charged. Included in the stolen money were twenty-five so-called bait bills, i. e., those whose serial numbers had been recorded. On June 12, 1967, the appellant deposited a large sum of money in the Girard Trust Bank which included eighteen of the bait bills. On June 14, 1967, FBI Agents executed a search warrant at appellant's home but apparently obtained no additional evidence. Approximately fourteen months later, in August, 1968, appellant was indicted by a grand jury for violating the Federal Bank Robbery Act, 18 U.S.C.A. § 2113 (1970). In January, 1971, approximately two years and five months after indictment, appellant was brought to trial, convicted by a jury and sentenced to fifteen years imprisonment. This appeal followed. The government's evidence showed that appellant had sub-

stantial opportunity to become acquainted with the pre-opening procedures of the bank's personnel, including the opening of the bank vault; that appellant's financial distress at about the time of the crime might have induced him to take this drastic step; that unusual activity in the area between appellant's home and the bank tended to place the perpetrators in that general area and hence, near appellant's home; and that appellant was seen in this area a few days after the robbery, perhaps to retrieve a hat, earlier found left at the scene. It was introduced in evidence and subsequently identified at trial as having been worn by one of the robbers.

Bank employees testified that appellant was a regular customer of the bank, both as a depositor and as a borrower. He transacted business there about once a month. During the weeks before the robbery, the appellant appeared at the bank more frequently. Several times in this period, he arrived before opening time and had the opportunity to observe the assistant manager open the vault and to examine the rear entrance which the robbers had forced open on the morning of the robbery. Although the evidence showed the robbers were in the bank a substantial period of time, none of the witnesses could identify the perpetrators who used apparently fool-proof disguises.

The evidence concerning appellant's financial distress showed that, at about the time of the robbery, a bank loan to appellant was two months delinquent. There was evidence, in addition, of other outstanding loans and of a mortgage for which accelerated payment in full was demanded as of June, 1967.

Several witnesses testified about the movements of a tan car in the area of the bank and appellant's home in the early morning hours of the day of the robbery. Mrs. Kaprolet, who lived in the area, testified on behalf of the government to seeing the car around 8:00 a. m. However, FBI Agent Bass was called by the government to testify that Mrs. Kaprolet told him, on April 21, 1967, she had seen the tan car near her

home twice, once at around 8:00 a. m. and a second time about 45 minutes later. Mrs. Kaprolet's testimony was important because a field search of this area turned up the hat allegedly worn by one of the robbers. We think it was error to permit the FBI agent to relate this hearsay statement of Mrs. Kaprolet. The hearsay exception for impeachment is inapplicable here since Mrs. Kaprolet was the government's witness and the government had no right to impeach her testimony under the circumstances.

A farmer, Mr. Kulp, who also lived in this area, related that on April 21, 1967, he observed a white pickup truck stop where Mrs. Kaprolet said she had seen the tan car. A man got out of the truck, looked around and then left. Mr. Kulp recorded the license plate number, and FBI Agent Bass testified from his investigatory notes that Mr. Kulp gave him the number S0633. The evidence showed appellant owned two pickup trucks with plate numbers S6003R and S6002R.

The main points of the appellant's case were that the large deposit he made in June, 1967, was a customary business transaction arising from the seasonal nature of his business; that he could not have participated in the crime because he was home asleep and without transportation; and that reputation witnesses testifying in his favor established that he was not a likely candidate for such a crime.

The evidence showed that appellant was in the business of running fairs in the area, and that his entire income was earned beginning in June and ending in October. Appellant's explanation of the presence of the eighteen bait bills in his deposit at the Girard Trust Bank was that he had recently received a large check from a horse show and cashed it at another bank (it was conceded that the Girard Trust Bank deposit money was in the wrappers of this other bank),

presumably receiving the bait bills in the cash from this third bank.

Appellant testified at the trial that the morning of the robbery he arose around 8:45, received a call from a Mr. Cyzewsky, his business partner, at around 9:00 and left his house around 9:30. He said he had quarreled with his wife the day before and that she had left with the car. He also testified that his trucks were not in operating condition on the day of the robbery, and that he had taken one to be repaired at around 9:30 that morning.

To corroborate appellant's alibi, Mr. Czyewsky testified that he talked to appellant on the phone at his home around 9:00 that morning. Finally, the defense also put witnesses on the stand who attested to the good reputation appellant enjoyed in the community.[1]

## THE ALIBI ISSUE

At the close of the case the trial judge charged the jury that the government bore the burden of proving appellant's guilt beyond a reasonable doubt; that this burden of persuasion continued throughout the trial; and that it never shifted to the appellant.

The charge also contained the following instruction:

"Obviously if he was at home he couldn't have been at the bank, and this is his alibi, if you call it that, and if you believe that and the Government hasn't convinced you beyond a reasonable doubt that he was not home but instead of being at home was at the bank, why, then of course you should find in favor of the Government. In other words, the alibi has not been established and the Government has not proved to you beyond a reasonable doubt that he was not at home."

Assuming that the judge was trying to explain the Government's burden of

1. Appellant complains of the trial court's ruling which allowed reputation witnesses to be asked if they were aware of a court martial conviction appellant had suffered in the military service thirteen years be-

fore. This issue was governed generally by the trial court's exercise of discretion. Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948).

proving beyond a reasonable doubt that the appellant was not at home at the time of the robbery, it is evident that the last two sentences of this quoted excerpt do not express the intended instructions. Following the court's charge both the prosecution and defense counsel suggested a need for clarification of this segment of the charge. Specifically, appellant's counsel asked the trial judge to instruct the jury that whenever a defendant offers evidence of an alibi the burden remains on the Government to disprove it beyond a reasonable doubt. The judge refused this request, retorting that his charge had sufficiently covered this point. However, subsequently, by way of further charge, he did instruct that:

"Now, the defendant called to my attention that in a criminal case such as this the defendant doesn't have to prove anything. I thought you assumed that from the fact that it is the Government's burden of proof throughout to convince you beyond a reasonable doubt. I didn't mention that specifically, but that is the fact. It isn't up to them to prove anything. It is up to the government to prove its case. The defense may, if they wish, which they attempted to do in this case, but it isn't required by the law. The law requires that the Government convince you beyond a reasonable doubt."

■■■ This supplemental instruction still did not make clear that, on the issue of alibi, the government had to convince the jury beyond a reasonable doubt that the alibi was not true. Just as the language in the first quoted excerpt was confused, so this charge made only an oblique reference to the alibi defense. The inadequacy of both charges was not cured by the general allusion, interspliced throughout the entire instruction, to the fact that the Government bore the burden of persuasion on all issues raised at trial.

In United States v. Barrasso, 267 F.2d 908 (3d Cir. 1959), the defendant had requested a charge on the burden of proof on the alibi issue. The trial court instructed the jury that:

"Ladies and gentlemen of the jury, there has been set up in this trial the defense of alibi. That means that the accused says he was not present, he was somewhere else, and that he could not have participated in this crime. If you believe that, that ends it because if he weren't there at any time he is alleged to have been there, he couldn't have done it. So alibi, if you believe the testimony as to his being elsewhere, is a perfectly good defense. That was called to my attention by counsel but I thought it was self-evident."

The court in reviewing that instruction ruled that:

"In thus charging the jury the court omitted altogether the conception and rule that the accused has to do no more than to create in the minds of the jurors a substantial doubt concerning his whereabouts at the time in question. Indeed, the court may well have suggested to the jury that the accused bore the burden of persuasion on the alibi defense when it charged: *'if you believe the testimony as to his being elsewhere,* (that alibi) is a perfectly good defense.'" (Emphasis in original.)

A comparison of the charge in the case at hand with the charge in *Barrasso* quickly reveals that the decision we make here must be ruled by that opinion. The insufficiency of the charge of the trial court is not cured by the more general language in the charge that the burden of proof never shifts from the government. This very contention was explictly rejected in *Barrasso*. A defendant is entitled to specific instructions on the burden of proof on alibi issues because the jury is likely to become confused about the burden of proof when an appellant offers this type of evidence. When affirmative proof, best known by the defendant himself, is offered, a likelihood exists that jurors would look to that proof for persuasion of its truth. But the correct approach is that such

proof need only raise a reasonable doubt in the jurors' minds as to whether defendant was present at the scene.

We therefore conclude that the district court's charge contained reversible error. Since we are ordering a new trial and since some of the other issues posed may arise again, in the interest of the efficient administration of justice we address ourselves to such issues.

## ALLEGED HEARSAY NATURE OF THE LICENSE NUMBER EVIDENCE

A Mr. Kulp, who was a farmer living in the general vicinity of the crime, testified for the government that, on April 21, 1967, he observed a man in a white pickup truck stop and look around in the area where the farmer had seen police activity several days before. The hat allegedly worn by one of the robbers had been found there. This testimony was critical to the prosecution's case. If it could be established that the appellant was the man who searched the area on April 21, it would be if unexplained, a very strong circumstantial indication of appellant's involvement in the crime. The following colloquy occurred in the direct examination of Mr. Kulp:

"Q: Now, were you subsequently interviewed by an agent from the FBI?

"A: The FBI, yes.

"Q: Did you give him a license number that you had seen?

"A: Yes.

"Q: You did, all right. Now this was a little less than four years ago. Do you today remember that license plate number as you gave it to the FBI?

"A: No, I wouldn't remember that license number.

"Q: Did we discuss this matter within the past hour?

"A: What's that?

"Q: Did we discuss this matter of your testifying within the past hour up in my office?

"A: Yes.

"Q: Did I read you a report from the FBI regarding their interviewing you?

"A: That's right.

"Q: And did I read you that license number that was in that report?

"A: Yes, you did. I don't remember that number.

"Q: All right. The license number that I read to you from that report, did that jibe with your recollection of what you reported to the FBI?

"DEFENSE COUNSEL: I object, sir.

"A: That's right.

"THE COURT: Overruled.

"DEFENSE COUNSEL: He has already testified that he doesn't remember.

"THE COURT: Overruled. That is not the question.

"PROSECUTOR: Your Honor, I ask leave of the Court to tender to the witness the FBI report.

"THE COURT: No. You can call the FBI Agent if you wish."

After Mr. Kulp's cross-examination, FBI Agent Bass was called by the prosecution. Bass testified that Mr. Kulp had given him a license number. Using the written FBI report to refresh his recollection, Bass testified the license number was S0633. Subsequent testimony revealed that defendant's two trucks bore plate numbers S6003R and S6002R.

The objection to this part of the prosecution's case raised here by appellant is that FBI Agent Bass impermissibly testified as to hearsay, i. e., Mr. Kulp's oral statement to Agent Bass. The only question for us is whether one or more of the many exceptions to the hearsay rule applies.

■■ Witnesses may use any aid to refresh their recollections. Reading Kulp's answer to the prosecution's question whether the report "jibed" with his recollection, it might be concluded that

the witness' memory of the plate number was thereby revived. If so, Kulp should then have gone on to relate his revived memory of the number. In such circumstances, there was no need to admit the FBI report into evidence or to bring the Agent to the stand. The rule in cases of refreshed recollection is that the writing may not be admitted into evidence or its contents even seen by the jury. 3 Wigmore, Evidence § 763, (Chadbourn rev. 1970) and cases cited at 142 n. 1.

■■ It is not entirely clear on this record whether Kulp's memory had, in fact, been refreshed. If not, resort must be had by the prosecution to the hearsay exception for past recollection recorded. If Mr. Kulp's memory is not revived by the FBI Report, he may nevertheless testify from its contents if certain conditions are met. A prerequisite of such testimony is ascertaining the identity and accuracy of the record used. 3 Wigmore, Evidence § 747, *supra*. If Kulp had testified that he read the report over after the FBI Agent made it and was, at that time, satisfied that it was correct, sufficient proof of the report's accuracy would have been made out. Since Kulp did not so testify, the more difficult question is whether there is any other basis for admitting the license plate number.

■ Some courts and textwriters have taken the view that where as here, a record is the joint product of two individuals, one who makes an oral statement and one who embodies it in a writing, if both parties are available to testify at trial as to the accuracy with which each performed his role, the recollection may be admitted. *See e. g.,* Swart v. United States, 394 F.2d 5 (9th Cir. 1968); 3 Wigmore, Evidence § 751, *supra;* Morgan, The Relation Between Hearsay and Preserved Memory, 40 Harv.L.Rev. 712, 720 (1927). We think such an exception to the hearsay rule is sound and adopt it here. If Agent Bass can verify the accuracy of his transcrip-

tion and if Kulp can testify he related an accurate recollection of the number to Agent Bass, we believe that, even though Kulp may not have read the report, sufficient indicia of its accuracy exist to let the evidence go to the jury. If the appropriate evidentiary basis is established at the retrial we think that the appellant would be entitled to an instruction on this point to the effect that in view of the elapsed time since Kulp reported to the FBI, the jurors should cautiously consider the degree of reliability the offered recollection deserves and that no more weight should be accorded it than such degree dictates.

### ALLEGED FAILURE TO PRODUCE BRADY MATERIALS

■ Appellant complains that the prosecution illegally suppressed exculpatory evidence obtained in the course of investigating appellant's alibi. The allegedly suppressed evidence consisted of statements of local persons who corroborated appellant's statements to government investigators as to what he did after 9:30 or 10:00 the morning of the robbery. It is apparent that such evidence could not help appellant's case in any significant way. The alibi relates to appellant's whereabouts between 8:00 and 9:00 on the morning of the robbery. Events occurring later in the day, although possibly of interest to investigators tracking a suspect, could lend no support to appellant's case. It was not reversible error to exclude such evidence.

### DENIAL OF A SPEEDY TRIAL

Appellant alleges that the trial court erroneously refused to dismiss the indictment on the ground that his right to a speedy trial, guaranteed by the Sixth Amendment of the Constitution, was denied. He contends the delays involved in bringing him to trial were excessive. The robbery occurred on April 18, 1967. Appellant was indicted in August of

1968—although his home had been searched in June of 1967, nearly 16 months earlier. Trial did not commence until January of 1971, 29 months after indictment and 45 months after the robbery. This is indeed a serious delay.

In a nation of crowded courts and busy lawyers, delays of some length are common. The contention is often raised in Courts of Appeals that particular delays deprived appellants of Sixth Amendment rights. Only rarely do these contentions succeed. The Supreme Court has laid down very broad guidelines in interpreting Sixth Amendment rights, although it has never had before it the "ordinary" delay case into which category the instant case falls.

The Court in Hedgepeth v. United States, 124 U.S.App.D.C. 291, 364 F.2d 684 (1966), admirably elaborated the considerations courts must take into account in this area:

"Whether a delay in bringing a defendant to trial results in a denial of his right to a speedy trial requires an analysis of the particular circumstances of each case. There is no touchstone of time which sets a fixed maximum period that automatically requires application of the Sixth Amendment and dismissal of the indictment. Time is but one factor, albeit the most important; the longer the time between arrest and trial, the heavier the burden of the Government in arguing that the right to a speedy trial has not been abridged. Other factors to be considered are the reasons for the delay, the diligence vel non of prosecutor, court, and defense counsel, and the likelihood, or at least reasonable possibility, that defendant has been prejudiced by the delay. It must be borne in mind that the prosecution, not the defense, is charged with bringing a case to trial. The Government may not 'sit back' and then argue that defendant's inaction conclusively waived his right to a speedy trial. On the other hand, it is equally clear that the Constitution cannot be applied so as to reward defense counsel who tolerates delay for tactical reasons."

One of the very difficult questions which often arises on speedy trial arguments, and which is posed in this very case, is whether a showing of actual prejudice is required. The Courts of Appeals are not in agreement. Judge Leventhal, in his *Hedgepeth* opinion, *supra* at 687 n. 3, espoused the belief that a showing of actual prejudice to the defendant is not an absolute prerequisite to a successful speedy trial contention. In his view the "very assumption" of the Sixth Amendment is that long delay prejudices defendants. Judge Leventhal admits, however, in the same opinion, that "the likelihood of prejudice is undoubtedly an inevitable consideration in determining whether a particular delay is undue." Taking the other view, Judge Coffin, writing for the First Circuit Court of Appeals in United States v. DeLeo, 422 F.2d 487 (1st Cir. 1970), cert. denied 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970), stated that defendant bears the burden of proving actual prejudice to support his speedy trial contention.

Reviewing the cases, it is not uncommon for long delays to be countenanced by Appeals Courts. *See, e. g.,* United States v. Penland, 429 F.2d 9 (9th Cir. 1970) (17 months); United States v. Carosiello, 439 F.2d 942 (3d Cir. 1971) (40 months). Frequently, the judges will advert to defendant's failure to demand a speedy trial during the delay or to do some other act to expedite the case, as in United States v. Carosiello, *supra*. More often, however, judges, whether using Judge Leventhal's or Judge Coffin's view of the import of actual prejudice, will conclude that insufficient harm to defendant's ability to defend himself has occurred.

The appellant claims that his ability to remember was adversely affected by the delay. He also claims the same adverse effect on memory was suffered by his corroborative alibi witness, Mr. Czewsky. Specifically, on defendant's cross-

examination, he was unable to remember where he had been on April 21, 1967, the day Mr. Kulp testified to seeing a man scan the area where the tan car was seen. Appellant did say that he knew he did not visit that particular area on the 21st. As to Mr. Czyewsky, his inability to recall had to do with whether or not he knew, back on the 18th of April, 1967, that the appellant's means of transportation were inoperable. The prosecutor was able to point to statements made to the FBI by Mr. Czyewsky to the effect that he knew appellant had no transportation. This contradiction presumably weakened somewhat the value of his testimony.

There is some suggestion in the record that appellant may be able to show prejudice exceeding that just described.[2] We think more is needed to substantiate the claim. Mr. Czyewsky's failure to recall seems to us a very minor point against his credibility. Similarly, appellant's assertion that he did not visit the scene of the alleged "getaway" switch point on April 21 represents at least some recall of that day; the fact that he could not say where he was in fact on the 21st did not help his case, but it was not crucial.

Therefore, absent some showing of other, more substantial prejudice, the trial court should reject this claim. However, we think the trial court should fully consider this issue again after appellant has an opportunity to perfect his record. We adopt this course because of the prolonged delay before trial and in the light of one of the clearest principles in the speedy trial area, to wit, that purposeful, oppressive prosecutorial delay violates the Sixth Amendment. Pollard v. United States, 352 U.S. 354, 361, 77 S.Ct. 481, 1 L.Ed.2d 393 (1951).

The judgment of conviction will be reversed and a new trial ordered unless the district court is in a position to decide prior to trial that appellant was denied a speedy trial.

2. On the motion to dismiss in the trial court the appellant alleged certain witnesses were no longer available.