**UNITED STATES OF AMERICA, Appellee**

**v.**

**HITSON SIMON a/k/a "SACKO", Appellant**

[995 F.2d 1236]

No. 91-3738

United States Court of Appeals

for the Third Circuit

June 7, 1993

HUGH P. MABE, III, Acting United States Attorney; JAMES A. HURD, JR. (Argued), Assistant United States Attorney, Charlotte Amalie, St. Thomas, V.I., *for appellee*

IVER A. STRIDIRON (Argued), Charlotte Amalie, St. Thomas, V.I., *for appellant*

BEFORE: GREENBERG, SCIRICA and GARTH, *Circuit Judges*

## OPINION OF THE COURT

GARTH, *Circuit Judge*

At the murder trial of appellant Hitson Simon, the district court committed error when it failed to instruct the jury on the government's burden of proof in relation to an alibi defense, as is required under the law of this circuit. However, in light of the entire record, which we have independently reviewed, we conclude that the evidence overwhelmingly demonstrated Simon's guilt beyond a reasonable doubt, and that, therefore, the district court's otherwise reversible error, was harmless.

## I.

On the afternoon of Sunday, March 31, 1991, Darrel Nicholson was killed by a single gunshot to the head, fired at close range as Nicholson lay sleeping on a wooden plank in an open shed, or "shanty," in the Stronne Gade area of St. Thomas. The shanty and an adjacent basketball court comprised a regular gathering place, a "hangout," for a group of St. Thomas youths, including Hitson Simon. (See A. 96).

In the aftermath of the murder, the statements of eyewitnesses led officers of the Virgin Islands Police Department to appellant Hitson Simon. Simon subsequently was arrested at his home, and charged with murder in the first degree and with possession of a dangerous weapon during the commission of a violent crime.

At trial, the government presented photographic evidence collected at the scene of the murder, along with the testimony of investigating and arresting police officers. At the heart of the trial, however, and at the focal point of our review, was the testimony of government and defense witnesses regarding Simon's whereabouts at the time of the murder.

400

## A.

The government presented four eyewitnesses, all of whom placed Hitson Simon at the basketball court, in the shanty, with a pistol in his hand at the moment the fatal shot was fired:

*Anthony Fitzgerald Brewley.*

Anthony Brewley testified that he had grown up with Simon and had known him for fifteen years. (A. 72). Brewley testified that he had spent most of the day on March 31, 1991—from 11:00 a.m. until 5:00 p.m.—at the basketball court. Id. Brewley testified further that, as he washed his car beside the shanty at approximately 3:45 to 4:00 p.m., Simon arrived at the shanty, (A. 74), and that shortly thereafter, he heard what he described as "a long, loud noise." (A. 75). Looking through a glass window, Brewley saw Simon backing out of the shanty. Id. According to Brewley, "[t]he rest of the guys" then said that someone had been shot in the head and killed. Id. When asked at trial if he was certain that the person he saw leaving the shanty after the gunshot was Simon, Brewley responded, "There is no doubt in my mind, who I saw." (A. 75-76).

*Keith R. Harrigan.*

Keith Harrigan testified that he had been a friend of Hitson Simon, also known as "Sacko," for about five years. (A. 81, 96). Harrigan said that he spent "[a]ll day" on March 31 at the basketball court, having arrived there at 7:00 a.m. (A. 81). Harrigan also testified that at 4:00 p.m., as he was working on his car directly adjacent to the shanty,[1] Simon arrived. (A. 83-84).

Harrigan then saw Simon enter the Shanty, (A. 84), and soon thereafter,[2] he "heard a shot." (A. 84). Jason Maduro, also known as "Tayo," (A. 136), came out of the shanty and said "our friend is dead." (A. 84). Harrigan testified that he then saw Simon holding a pistol wrapped in a white cloth, id., that he "saw the nozzle pointing at us," (A. 85), and that Simon was "telling us we didn't see

---

[1] Harrigan testified that he was close enough to the shanty that he could "reach out and touch" it from where he stood. (A. 83).

[2] On cross-examination, Harrigan stated that Simon was "not long" in the shanty, "not even a good five, six minutes." (A. 91). Defense counsel asked, "[Was it a]bout two, three minutes, perhaps?" Harrigan answered, "Yes. It was kind of quick." Id.

nothing." (A. 84, 85). As Simon departed, Harrigan "heard him mention something like, 'the same thing you did with my friend is the same thing I did to you.'" (A. 85). Harrigan had "no idea" as to what Simon was referring. (A. 86).

*Jefferson Titus.*

Titus testified that he, too, had spent "the whole day" on March 31 at the basketball court, beginning at 11:00 a.m. (A. 99). He also testified that he had known Hitson Simon for four or five years, and that Simon "used to live right down the steps from where I live." Id. When asked about his relationship with both Simon and the victim, Titus stated, "we were just cool friends, all of us." (A. 101).

At 3:00 or 4:00 p.m., Titus saw Simon walk "below the shanty." (A. 102, 103-104). "The next thing," Titus testified, "I hear the gunshot fire." (A. 104). Titus saw Simon "when he came out of the shanty." Id. He observed what he described as "the look of fear" on the faces of Jason Maduro, "Tayo," and another friend known as "Junior," id., and that he heard Simon tell them "that he ain't want no witnesses, he ain't want to hear nothing." Id. When Titus asked Simon what he had done, Simon "point the gun at me and he tell me to shut up and just be quiet. He ain't want to hear nothing." Id. Titus described the gun as a black, palm-sized automatic handgun, and that Simon held both the pistol and a white cloth in the same hand. (A. 106). Simon departed "a couple of seconds" later. (A. 104).

*Jason D. Maduro.*

Jason Maduro, also known as "Tayo," testified that he was a friend of Simon and had known him for "about seven to eight years now." (A. 120). Maduro testified that he had arrived at the basketball court on March 31 at 10:00 a.m. and remained there "[u]ntil nighttime." (A. 119). Simon arrived shortly after 4:00 p.m. (A. 125). From Maduro's vantage point, "right on the outside of the shanty, on the basketball court," (A. 121), he saw Simon enter the shanty and pull a "white handkerchief" from the waist of his pants.[3]

---

[3] With the aid of photographs of the shanty's interior, depicting a view of the victim's body lying where it fell after the gunshot, Maduro testified that his

After that, I was looking straight out at the Education Building, and then after I heard the gunshot I looked across before Ronnie [the victim] fell to the ground, and Sacko [Simon] was there standing, saying—he was there saying, "The same way you do our friend is the same way you get it."

(A. 126-127). Like Keith Harrigan, Maduro did not know to what Simon was referring. (A. 133).

Later in his testimony, after reviewing a contemporaneous statement he made to the police, Maduro testified that he heard Simon "crank," or cock the weapon, prompting him to "look across" into the shanty. (A. 132).

Q. What did you see when you looked across?
A. He bent over and he hold the pistol to Ronnie [the victim's] head.
Q. What did he do when he held it to his head?
A. He fired it.
Q. You observed this yourself, this happen, sir?
A. Yes.
Q. How far away were you?
A. About fifteen feet away, ten to fifteen feet.

Id.

Maduro then explained that, after he heard Simon "crank" the handgun and bend over the sleeping victim, "that is when I looked out," (A. 138; see A. 142-143), so that when the shot was fired, he was looking at the Board of Education Building. (A. 138-139; 143). Immediately after the shot was fired, Maduro looked back into the shanty and saw blood coming from the victim's head as he fell to the floor, (A. 143), while Simon stood over the body with the gun in his hand. Id. Maduro then saw Simon walk out of the Shanty and heard him say "that he ain't want no witnesses." (A. 133).[4]

own view into the shanty permitted him to see both the victim as he lay sleeping on the wooden plank and Simon standing over him. (A. 124).

[4] In his memorandum of law addressing harmless error, which this court requested at oral argument, Simon appears to challenge the testimony of the government's witnesses, claiming, without citation to the record, that "[i]nitially, some of the government's witnesses indicated that they had actually witnessed the shooting of the deceased by the appellant," but that "on cross examination, each of the witnesses testified that they had not actually seen the shooting, nor for that matter did any one of them testify that the

## B.

In an effort to establish an alibi, the defense presented five witnesses, Simon's mother, father, nephew, brother, and a family friend. Simon presented no other witnesses to establish his whereabouts at the time of the murder.

*Derrick Parker.*

Parker testified that he was a friend of James Simon, Hitson Simon's brother, (A. 164), and that on Sunday, March 31, 1991, he and James had gone swimming down at the "bay" from approximately 10:00 or 11:00 in the morning until 2:00 in the afternoon. (167-168). At 2:00, Parker testified, Simon arrived at the bay, took a brief swim and departed, (A. 170), heading up the road toward home at about 2:20 p.m. (A. 172, 174). Parker did not see Simon again that day. Id.

*James Simon.*

Hitson Simon's older brother, James, testified that on March 31 he and Parker saw Simon at the bay at 2:00 p.m., (A. 178),[5] and that Simon took a ten to fifteen minute swim, (A. 179), before heading home at about 2:15. (A. 180-181). James also testified that he arrived at the Simon home at 2:30 p.m. and that he saw his brother Hitson there ten minutes later. (A. 182). James did not see Hitson again that day. (A. 183, 184). James testified further that it takes him twenty-five to thirty minutes to walk directly from the basketball court where the murder took place to the Simon home. (A. 190).[6]

----

appellant shot the decedent."

Contrary to counsel's assertion, upon independently reviewing the trial record, we have discovered no testimony, other than Maduro's subsequently clarified account, see text, supra, in which any government witness "initially" claimed to have observed the shooting. Rather, as is described in text, the government's witnesses consistently testified that they heard the gunshot, either immediately after they saw Simon enter the shanty or just before they saw him emerge therefrom (or both), gun in hand, telling those present that there were to be "no witnesses."

[5] James estimated that Hitson arrived at 2:00 p.m. because he "had started getting hungry," (A. 186), and because the afternoon sun was getting "real hot." (A. 187).

[6] Sergeant Reynald Fraser, of the Virgin Islands Police Department, testified that it would take him twenty minutes to walk the equivalent of the distance between the basketball court and the Simon home. (A. 159).

*Hitson Philmore Andrew.*

Simon's nephew, Hitson Andrew, testified that he lives with the Simon family, and that on March 31 he was at home between job shifts, from 2:30 p.m. until 5:00 p.m. (A. 193, 194, 199). Andrew testified further that he saw Hitson at home on four different occasions that day: at 3:15 p.m., (A. 195-196); at 3:30 to 3:40 p.m., (A. 197), sometime after 3:40 p.m., (A. 197-198); and at 4:30 p.m. (198-199).

Detective Sergeant Reynald Fraser of the Virgin Islands Police Department testified that on the evening of March 31, Hitson Andrew told him that "he did not see Hitson for that entire day. He did not see him at all." (A. 249). On cross-examination, Andrew simply denied having made that statement to Detective Fraser. (A. 209-210).

*Edith Simon.*

Simon's mother, Edith Simon, testified that on March 31 she left home at 10:30 or 11:00 in the morning, and that she returned at about 1:30 in the afternoon. (A. 212, 213). She also testified that, as she prepared to take a nap at 3:30 or 3:35 p.m., she saw her son "com[ing] through the dining room." (A. 213, 214). Ms. Simon testified further that she was awakened at 5:15 p.m. when the police arrived in search of her son. (A. 216). According to Ms. Simon, she told the police that her son could not have committed the murder at the basketball court at 4:30 p.m., because a pot of food on his stove was hot when the police arrived at 5:15. (A. 219-220).

On cross-examination, Ms. Simon testified that she had not seen Hitson prior to 3:30 or so in the afternoon. (A. 226). However, Sergeant Fraser testified that on March 31, Ms. Simon told him "that Hitson was home all day. He did not leave the house at all." (A. 250). At trial, Ms. Simon denied having made that statement to Fraser. (A. 229).

*Nathaniel Simon.*

Simon's father, Nathaniel, testified that when he was at home on the afternoon of March 31, he heard his son Hitson speaking to his grandson at ten minutes to four. (A. 234). He testified further that he saw his son on the family property at 4:03 p.m. (236).

On cross-examination, Mr. Simon could not explain why he so clearly remembered that particular time. (A. 241). First, he stated,

"I just remember it." Id. Then, when asked whether he heard the time announced or was guessing at the time, Mr. Simon responded, "I ain't guessing the time. I hear it on the radio, the radio upstairs." (241-242). A few moments later, Mr. Simon testified that he did not hear the time announced on the radio, but that he was aware of the time, "4:03," because he had looked at his watch. (A.242-243).

On cross-examination, government counsel confronted Mr. Simon with two prior statements attributed to him by Sergeant Fraser: first, that he had not seen his son since breakfast on March 31, and, second, that he did know whether his son had left the house that day. (A. 244-245).[7] Mr. Simon simply denied having made both statements. (245).

## C.

Following the presentation of evidence, the government submitted to the trial court a set of proposed jury instructions, with which counsel for Simon concurred. On the issue of alibi, the proposed instruction read as follows:

> The defendant, HITSON SIMON, has asserted the defense of alibi as his defense to the murder and weapon charges.

> Evidence has been introduced tending to establish an alibi, which amounts to a contention that the defendant was not present at the time when or at the place where he is alleged to have committed the offense charged in the [indictment].

> If, after consideration of all the evidence in the case, you have *a reasonable doubt as to whether the defendant was present* at the time and place the alleged offense was committed, you must acquit him.

> The jury will bear in mind the government's burden of establishing the involvement of the defendant, and all other elements of the offense as defined in these instructions, by proof beyond a reasonable doubt.

Government's Request to Charge at 8 (Anders brief, addendum at 11) (emphasis added).

---

[7] On rebuttal, Sergeant Fraser testified that, indeed, Mr. Simon had told him that he went "upstairs" to work after seeing Hitson at breakfast and did not know that Hitson had left the house. (A. 249).

The trial judge, however, elected not to recite to the jury the government's proposed alibi charge. Rather, the court gave the following instruction:

You must consider all of the evidence in the case. You have heard witnesses presented from the prosecution and you have heard witnesses presented from the defense. *You have to decide who you believe and how much of what is said by any witness you believe.*

You have heard witnesses who said that it was the defendant who shot Nicholson, and you have heard witnesses who said that Mr. Simon was in their sight or presence at various times, inconsistent with his allegedly being at the place and at the time where the homicide occurred.

It is up to you. *You have to determine* from all of the evidence which you must consider, *who you believe and how much of what is said by any witness you credit.*

(A. 345-346) (emphasis added).

Earlier in his charge to the jury, the trial judge had instructed that

[t]he accused has no burden of proof under our system of laws, has no obligation to attempt to prove himself innocent of the charges. *The prosecution has the only burden of proof in the case, and that burden of proof never shifts to a defendant,* even if the defendant were to call witnesses.

That burden of proof is proof beyond a reasonable doubt as to each essential element of the charge in each count.

\* \* \*

If you are persuaded that the government has met its burden of proof as to each essential element of a count, as to that count you should return a verdict of guilty. *If you are not persuaded that the government has met its burden of proof as to any essential element of any count, as to that count you must return a verdict of not guilty.*

(A. 334-336) (emphasis added).

██ Counsel for Simon objected to the jury instruction, noting that the government's proposed charge had not been read and requesting the court to do so. (A. 350). After reviewing a copy of the

407

government's requested instruction, the trial court stated, "I did exactly that. I did not use the word 'alibi.' I will not." Id.[8]

So instructed, the jury returned verdicts of guilty on both counts, murder in the first degree and possession of a dangerous weapon during the commission of a crime of violence. On October 16, 1991, Simon was sentenced to life imprisonment without suspension, parole or reduction in sentence as to the murder conviction, and to a concurrent term of ten years imprisonment on the "dangerous weapon" conviction, also to be served without suspension, parole or reduction. Simon timely appealed from the October 16, 1991 judgment and commitment entered by the district court.

## II.

■■ On appeal, counsel for Simon filed with this court a document styled, "Anders brief,"[9] in which he argued that the trial court committed reversible error by failing to include the word, "alibi," in its jury instruction. The "Anders brief" was accom-

---

[8] The question of whether Simon's counsel objected to the jury charge based on the absence of the required instruction regarding the standard and burden of proof is critical to the determination of the appropriate standard of review. If the issue had not been preserved through an objection at trial, the "plain error" standard would apply. See Simmons v. City of Philadelphia, 947 F.2d 1042 (3d Cir. 1991), cert. denied, 112 S.Ct. 1671 (1992). If a timely objection did preserve the issue for appeal, the legal requirements for an alibi instruction would be subject to plenary review. See Savarese v. Agriss, 883 F.2d 1194, 1202 (3d Cir. 1989).

Although Simon's counsel may have objected to the jury charge only because the word "alibi" had been excluded, his objection also included a request that the Government's proposed charge be read to the jury. That charge included the statement that "[i]f . . . you have a reasonable doubt as to whether the defendant was present at the time and place the alleged offense was committed, you must acquit him." Anders brief at 11. Thus, the objection may be construed to have encompassed the issue of whether the instruction given complied with the requirements of United States v. Booz, 451 F.2d 719 (3d Cir. 1971), cert. denied, 414 U.S. 820 (1973), and United States v. Barrasso, 267 F.2d 908, 910-911 (3d Cir. 1959), see text, infra, thereby preserving that issue for appeal.

[9] Under Anders v. California, 386 U.S. 738 (1967), counsel may advise the Court of Appeals that an appeal is wholly frivolous and, therefore, may request permission to withdraw, so long as he has conscientiously reviewed the matter and accompanies his request with a "brief referring to anything in the record that might arguably support the appeal." Id. at 744.

panied by counsel's "Anders Motion to Withdraw Appeal."[10] In that motion, counsel claimed that "after diligent and exhaustive review of the case," he was "unable to determine that any issue or error exists . . . which could be appealed; the probability or non-probability of success not being a factor in counsel's review of the record." Counsel lamented the refusal of Simon and his parents to permit an insanity defense. "Such a defense," counsel suggested, "may have offered the only avenue for an acquittal at the trial level, or failing that, for an appeal to the appellate court." Thus, counsel "move[d] that the instant appeal be dismissed as not having presented issues which are ripe for appeal."

■■ The government, for its part, elected not to file a response to the Anders brief. Nevertheless, after conducting an independent review of the pertinent case law, this court, on its own, uncovered an apparent discrepancy between the trial court's alibi instruction and the instruction required under the law of this circuit—a discrepancy having nothing to do with the absence of the word, "alibi."[11]

■ This court has long held that where, as here, a defendant asserts the defense of alibi, a jury instruction must make clear that the defendant need only raise a *reasonable doubt* in the jurors' minds as to whether he was present at the scene of the charged offense at

---

[10] We have construed the "Anders Motion to Withdraw Appeal" as a motion by Simon's counsel to withdraw as counsel to Simon pursuant to Anders. See note 9, supra. In light of our analysis and our request for Simon's counsel to appear at oral argument, we deny the motion as so construed.

[11] Indeed, "[i]t is clear that the language of the [jury] charge is left to the discretion of the court." United States v. Carter, 756 F.2d 310, 314 (3d Cir. 1985), cert. denied, 478 U.S. 1009 (1986). Moreover, the trial court's jury instruction will not comprise reversible error if, "'taken as a whole and viewed in the light of the evidence, [the instruction] fairly and adequately submits the issues in the case to the jury [without confusing or misleading the jurors].'" United States v. Messerlian, 832 F.2d 778, 789 (3d Cir. 1987), cert. denied, 485 U.S. 988 (1988) (quoting United States v. Fischbach & Moore, Inc., 750 F.2d 1183, 1195 (3d cir. 1984), cert. denied, 470 U.S. 1029 (1985)).

Thus, the mere absence of the word, "alibi," in the district court's charge would not, alone, amount to reversible error, so long as the charge otherwise provided "'a clear articulation of the relevant legal criteria [for a jury's evaluation of an alibi defense].'" Messerlian, 832 F.2d at 789 (quoting United States v. Goldblatt, 813 F.2d 619, 623 (3d Cir. 1987)). Accordingly, we are unpersuaded by Simon's reiteration of this argument in his post-oral argument memorandum of law on harmless error. See Part III, infra.

the time the offense was committed. See United States v. Booz, 451 F.2d 719, 723 (3d Cir. 1971), cert. denied, 414 U.S. 820 (1973) (citing United States v. Barrasso, 267 F.2d 908, 910-911 (3d Cir. 1959)).

Accordingly, a defendant is entitled to a specific instruction that *"on the issue of alibi*, the government ha[s] to convince the jury beyond a reasonable doubt that the alibi was not true." Booz, 451 F.2d at 723. See also Barrasso, 267 F.2d 908, 910-911 (3d Cir. 1959) (quoting United States v. Marcus, 166 F.2d 497, 503-504 (3d Cir. 1948) (specific instruction must be given to inform the jury "that the government's burden of proof covers the defense of alibi, as well as all other phases of the case"). We require such a specific instruction regarding an alibi defense because "the jury is likely to become confused about the burden of proof when an appellant offers this type of evidence." Booz, 451 F.2d at 723.

In light of the controlling precedent, this court instructed the parties to file supplemental memoranda on the issue of whether the trial court's instruction conformed with Booz and Barrasso. Not surprisingly, Simon's counsel—with the benefit of the dispositive cases now before him—argued that the instruction given failed to conform to this court's precedent and that, therefore, a new trial was required. The government agreed and confessed error on the issue of the alibi defense, conceding that the present case was indistinguishable from Booz and Barrasso.

■ We, too, conclude that when the trial judge instructed the jury that "[y]ou have to decide who you believe and how much of what is said by any witness you believe," the court failed to set forth the government's burden of proof in relation to the alibi defense, as is expressly required under Booz and Barrasso. The trial court's instruction in this case was similar in content to that given in Barrasso, a case in which we held the instruction to have been deficient. We reversed the district court's judgment of conviction in Barrasso because the district court judge charged that "alibi, *if you believe the testimony as to [the defendant's] being elsewhere*, is a perfectly good defense," and that "*[i]f you believe that*, that ends it . . . ." Barrasso, 267 F.2d at 910 (emphasis added). In Barrasso, as here, such an instruction "may well have suggested to the jury that the accused bore the burden of persuasion on the alibi defense," id., and was, therefore, in error.

■ Moreover, given Simon's defense of alibi, the trial court's failure to provide a "Booz-Barrasso charge" was not cured by the

410

general instruction that the government must prove guilt beyond a reasonable doubt, (A. 334-336);[12] nor was the district court's error cured by the general admonition that the "burden of proof never shifts to a defendant." (A. 334-336). Although this court adheres to the longstanding principle that a jury instruction must be read in its entirety, and that it must not be reviewed in fragmented form, out of the context of the entire trial, see Rock v. Zimmerman, 959 F.2d 1237, 1246 (3d Cir.), cert. denied sub nom. Rock v. Preate, 112 S.Ct. 3036 (1992) (citing Estelle v. Mcquire, 112 S.Ct. 475 (1991); Hallowell v. Keve, 555 F.2d 103, 113 (3d. Cir. 1977)), in the special case of an alibi defense the jury charge on alibi must include a specific instruction setting forth the government's burden of proof. See Booz, 451 F.2d at 723 ("The insufficiency of the charge of the trial court is not cured by the more general language in the charge that the burden never shifts from the government. This very contention was explicitly rejected in Barrasso."); Barrasso, 267 F.2d at 910-11 (insufficient charge on alibi was not "cured by a quite proper and forceful general instruction stating in clear language that throughout the case the burden remains on the government to convince the jury of guilt beyond a reasonable doubt").

Our determination that the trial court erred by failing to give the requisite Booz-Barrasso charge does not, however, end our inquiry. Having concluded that the district court committed error, we next must determine whether that error requires reversal, or whether it was harmless.

### III.

█ Although we inquired into the question of harmless error at oral argument, the parties had not yet briefed us on that issue, necessitating still another request for supplemental briefing. After having reviewed the arguments and having examined the entire record, we now conclude that the district court's error, violative as it was of a clearly stated rule, was harmless on the facts of this case.

### A.

The rule set forth in Booz and Barrasso is stated in supervisory terms. Indeed, neither opinion holds that the prescribed alibi in-

---

[12] By "general instruction," we mean one that is not integrated into the language of the alibi charge itself.

411

struction is constitutionally mandated. In articulating the harmless error standard for such non-constitutional error, this court has held that, "'[u]nless the appellate court believes it is highly probable that the error did not affect the judgment, it should reverse.'" Government of Virgin Islands v. Toto, 529 F.2d 278, 283-84 (3d Cir. 1975) (quoting R. Traynor, The Riddle of Harmless Error 35 (1970)).

> To constitute a 'high probability,' we must have a 'sure conviction that the error did not prejudice the defendant.' [United States v. Jannotti, 729 F.2d 213, 219-220 (3d Cir. 1984), cert. denied, 469 U.S. 880 (1984.)]' 'On the other hand, we may be firmly convinced that the error was harmless without disproving every "reasonable possibility of prejudice.'" [Id. at 219-20 & n.2 (quoting Traynor, supra, at 33-37, 44-45).]

United States v. Asher, 854 F.2d 1483, 1500 (3d Cir. 1988), cert. denied, 488 U.S. 1029 (1989). Thus, in light of our holding that the district court erred in failing to craft the alibi instruction in accordance with the rule of Booz and Barrasso, our inquiry into harmless error is narrow: does the evidence placing Simon at the scene of the murder at the time it was committed render it highly probable that the error did not affect the judgment? See Toto, 529 F.2d at 283-84.

 Although we regard the district court's error as non-constitutional in nature, we recognize that the improper alibi instruction also may be construed as "constitutional" error, to the extent that it suggests that the accused bears a burden of persuasion on the alibi defense.[13] See Yates v. Evatt, 111 S.Ct. 1884, 1892 (1991); Rose v. Clark, 478 U.S. 570, 575 n.3 (1986); Sandstrom v. Montana, 442 U.S. 510, 523-24 (1979); Patterson v. New York, 432 U.S. 197, 214-15 (1977); Mullaney v. Wilbur, 421 U.S. 684 (1975). Cf. Barrasso, 267 F.2d at 910; Booz, 451 F.2d at 723. In the present case, however, the distinction between constitutional and non-constitutional error is of no moment, because even if we were to apply the standard for constitutional error, we would hold that the district court's failure to give the Booz-Barrasso charge was harmless.

 This court most recently discussed the standard for harmless "constitutional" error in United States v. Kenney, No.

---

[13] Judge Scirica would hold that the error committed by the district court was constitutional in nature and would, therefore, be subject to—but on the record in this case would satisfy—the test for constitutional harmless error. See United States v. Kenney, No. 92-3299, slip op. at 6-8 (3d Cir. April 27, 1993).

92-3299, slip op. at 6-8 (3d Cir. April 27, 1993). "The test is whether the evidence is so overwhelming that it is beyond reasonable doubt that the verdict would have been the same" had the error not been committed. Id. at 7 (citing Yates, 111 S.Ct. at 1893-94). Recognizing that such an "enquiry cannot be a subjective one into the minds of the jurors," Yates, 111 S.Ct. at 1893, the Supreme Court has advised us that to hold an error harmless is "to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." Id. (citing Chapman v. California, 386 U.S. 18, 24 (1967)).

 After reviewing the record in this case, we conclude that the evidence placing Simon at the scene of the murder at the time it was committed renders it highly probable that the district court's non-constitutional error did not affect the judgment, and that it was, therefore, harmless. See Toto, 529 F.2d at 283-84; Asher, 854 F.2d at 1500. Moreover, even if the failure to give the required Booz-Barrasso alibi instruction could be classified as constitutional error, which we hold it is not, we nevertheless would deem that error to be harmless because the evidence here is overwhelming, establishing Simon's guilt beyond a reasonable doubt. See Kenney, No. 92-3299, slip op. at 7. See also Yates, 111 S.Ct. at 1893; Rose v. Clark, 478 U.S. at 579. Thus, under either the non-constitutional standard of Toto or even the constitutional standard of Yates (if that standard were applicable, which it is not), the failure to give the Booz-Barrasso required alibi instruction, while error, was nevertheless harmless.

## B.

As we have previously stated, four eyewitnesses, all of whom had known Hitson Simon for years prior to the murder, testified that Simon arrived at the basketball court in Stronne Gade at approximately 4:00 p.m. on March 31, 1991. Three eyewitnesses saw Simon enter the shanty where Nicholson lay sleeping. One witness saw him pull a gun wrapped in a white cloth from his waist as he approached the sleeping victim, and saw Simon standing over the mortally wounded and bleeding Nicholson immediately after the single shot was fired. All four eyewitnesses saw Simon emerge from the shanty immediately following the gunshot. Three testified that he had a pistol in his hand and that, before departing, admonished those present that there were to be "no witnesses."

Despite slight variations in their recollection or perception of immaterial details, the testimony of these four eyewitnesses consistently and compellingly placed Simon at the basketball court and inside the shanty at the time of the murder. Simon presented no evidence that might impugn the credibility of these eyewitnesses. The defense never challenged the means and opportunity of the witnesses to observe and recognize Simon, nor did the defense hypothesize or ascribe to the witnesses a motive to deliberately misidentify their friend and acquaintance, Hitson Simon, as the murderer.

In his post-oral argument memorandum on harmless error, Simon identifies three alleged inconsistencies in the testimony of government witnesses. None of those purported inconsistencies, however, is fairly characterized as such, and none has any bearing on the sole, controlling evidentiary issue before us, that being Simon's whereabouts when Nicholson was murdered.

First, Simon cites the government witnesses' apparently differing accounts of the time of the murder, ranging from 3:00 p.m. to 4:15 p.m. on March 31, 1991. Simon does not, however, dispute or otherwise challenge the most compelling and ultimately dispositive aspect of the witnesses' testimony: all four consistently placed Simon inside the shanty at the precise moment the fatal shot was fired. Moreover, the belief that Simon arrived at the scene at around 4:00 p.m., just before the shooting occurred, was common to the testimony of each witness. Anthony Brewley testified that Simon arrived at "approximately 3:45 to 4:00 o'clock," (A. 74); Keith Harrigan testified that Simon arrived at "around 4:00," (A. 83); Jason Maduro testified that he saw Simon arrive at "[a] little after 4:00 o'clock," (A. 121), and Jefferson Titus, who offered the widest ranging time-frame, testified that he saw Simon at "3:00 o'clock, 4:00 o'clock, something like that." (A. 102).

Second, Simon argues that the government witnesses "were inconsistent as to how many times they each claimed that the appellant appeared [on March 31, 1991] on the basketball court where the incident occurred." Rather than demonstrating inconsistency, however, the witnesses' testimony merely reflected their varied experiences on March 31. While they each may have seen Simon once, twice or three times *prior* to the shooting that day, what is dispositive here is that each and every government witness placed Simon in the shanty at the time Nicholson was murdered.

414

Finally, Simon claims that the witnesses "were inconsistent as to the number and identity of the persons who supposedly were in the shanty at the time the homicide occurred." Simon refers to the witnesses' uncertainty as to whether Jason Maduro ("Tayo") and another man known as "Junior" were inside or ·just outside the shanty when Nicholson was killed. Again, however, Maduro's and Junior's location in relation to the shanty is entirely irrelevant to the dispositive issue here of whether Simon was present at the time of the murder. Moreover, any disparity among the witnesses on this issue appears to be attributable to the distinctive configuration of the shanty—which, at least on one side, seems to have lacked a clear point of demarcation between "interior" and "exterior"— rather than to "inconsistent" testimony.

For example, Jefferson Titus testified that Maduro and Junior "were parallel to the shanty, on the outside of the shanty, right next to where you could walk to go inside." (A. 113). Titus stated further that "[t]hey were like a part of it [the shanty], you know, because the rock—like the shanty is here (indicating), and then the big stone is right here from the shanty. And you could look straight across and go into it, too, if you wanted to." (A. 117). According to Titus, from where Maduro and Junior were located, they could reach their hands out into the shanty. Id.

On the other hand, Simon presented five "alibi" witnesses: his mother, father, brother, nephew and a family friend. The credibility of three of those witnesses—the mother, father and nephew—was cast into substantial doubt by Detective Sergeant Fraser, whose testimony attributed to each of them prior statements that contradicted or were inconsistent with their testimony at trial. In his post-argument harmless error memorandum, Simon fails to address or account for the testimony of Detective Sergeant Fraser. Instead, Simon simply states in conclusory terms that the "defense witnesses were all consistent in their recollections" as to Simon whereabouts at the time of the murder, and that their testimony, therefore, was "clear and believable."

The testimony of Simon's other two witnesses failed to establish an alibi altogether. Derrick Parker last saw Simon at 2:20 p.m. on March 31, and brother James last saw him at home at 2:40 p.m. Given James' testimony that it takes a maximum of thirty minutes to walk between the Simon home and the basketball court, there simply is no conflict between his and Parker's testimony and the

415

eyewitness accounts of Simon's arrival at the basketball court at 4:00 p.m.

Thus, in light of all of the evidence considered by the jury—the eyewitness testimony placing Simon at the scene of the murder at the time it was committed; the suspect credibility of three "alibi" witnesses; and the failure of two others to support the alleged alibi time-frame—we conclude that the error committed by the district court in failing to instruct the jury on alibi, as we have required under both Booz and Barrasso, was harmless, in that it is highly probable that the error did not affect the judgment of Simon's conviction.

## IV.

We will therefore affirm the judgment and commitment entered by the district court on October 16, 1991.