TONY DUCKETT, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 17644

March 30, 1988                              752 P.2d 752

*Morgan D. Harris,* Public Defender, *Lee A. Gates,* Deputy, *Susan Deems Roske,* Deputy, Clark County, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Rex A. Bell,* District Attorney, *James Tufteland,* Deputy, and *Thomas Moreo,* Deputy, Clark County, for Respondent.

# OPINION

*Per Curiam:*

## The Facts

At approximately 9:30 p.m. January 31, 1986, Elmo Armstrong and his wife Margaret were murdered in their home, both repeatedly shot in the head.[1] Their granddaughters Latosha Armstrong and Ursula Page lived with them and were in the house when their grandparents were shot. At that time, Latosha was about eighteen years old; Ursula was nearly sixteen.

Latosha testified that at approximately 9:30, she heard someone knock loudly on the front door. The front door, usually not used, led to a hallway that provided access to various bedrooms

---

[1] Elmo was shot in the head five times; Margaret seven times. One expert testified that all but one of the bullets were fired from the same gun.

and the kitchen. Latosha then heard a sound like "someone knocking up against the wall." Curious, she went from the family room to the kitchen. Latosha then heard her grandfather say, "Tony," and her grandmother say, "Tony, what are you doing?" She suddenly heard four or five shots, followed by her grandmother exclaiming "Oh no. God. Oh, no." She then heard more shots.

Frightened, Latosha ran back into the family room and out the side door. Ursula, who was in the family room, followed her sister out of the house, running onto a sidewalk. Ursula testified she then saw "a person running in front of my sister, and then I saw my sister, and then I saw a person run past me and behind her." Both persons were carrying "long guns," apparently rifles. Afraid that her sister would be shot, Ursula screamed. As a result, the person who ran past her looked over his shoulder at her. Ursula testified that the area was lighted, and from about seven to ten yards, she recognized this person as Tony Duckett, her grandfather Elmo's nephew. She testified that she was well acquainted with his appearance because (1) he was her cousin, and (2) she had seen him many times before this encounter. Ursula then ran to the neighbor's yard and fainted. When the police came, she told them that she had seen Duckett running away from her grandparents' house.

Latosha also testified that one month before the murders, Duckett came to the house and asked his uncle, Elmo, for an advance on his salary. Duckett worked for Elmo. Elmo refused to give him any money, asked him to leave, and finally hit him in a effort to force him out of the house.

At trial, Duckett argued that he had been misidentified. He testified that at approximately 8:30 or 8:45 on the evening the murders occurred, he went to Francis Gilkey's home, together with his brother Kevin and another person named Tony, and stayed there until 10:00 p.m. His friends, Francis Gilkey and Brenda Montgomery, also testified that on the evening in question, Duckett was with them at Gilkey's home.

The jury convicted Duckett of one count of burglary and two counts of first-degree murder, sentencing him to life without the possibility of parole. He appeals these convictions.

## Discussion

Duckett presents three important issues for our consideration: (1) whether he was prejudiced by a failure to give alibi instructions; (2) whether he was prejudiced by being forced to wear shackles and jail garb during the sentencing hearing, and; (3) whether he was prejudiced by Judge Goldman's intervention and comments at trial.

Duckett requested the lower court to give the following jury instruction:

> The defendant has introduced evidence for the purpose of showing that he was not present at the time and place of the commission of the alleged offense for which he is here on trial. If, after a consideration of all the evidence, you have a reasonable doubt that the defendant was present at the time the crime was committed, he is entitled to an acquittal.

The lower court refused the proffered alibi instruction.

We have repeatedly held that "A defendant in a criminal case is entitled, upon request, to a jury instruction on his theory of the case so long as there is some evidence, no matter how weak or incredible, to support it." Roberts v. State, 102 Nev. 170, 172-73, 717 P.2d 1115, 1116 (1986). On the other hand, we have noted that a defendant is not entitled to "multiple instructions on the same subject." Wallace v. State, 84 Nev. 603, 605, 447 P.2d 30, 31 (1968). In this case, we are asked to determine whether alibi instructions must be given in addition to other instructions requiring the State to prove its case beyond a reasonable doubt, or whether they are an unnecessary reiteration of these other instructions.

Although we have not addressed this exact issue, a number of other courts have. The clear majority of states require a court to give alibi instructions if (1) there is some evidence to support the position that defendant was elsewhere when the crime occurred, and (2) the defendant request the instructions.[2] We agree with the majority view and conclude that, when requested and supported, alibi instructions should be given.

Although alibi instructions may, to some extent, merely be a reiteration of other instructions, they are not totally redundant.

---

[2]*E.g.,* United States v. Hicks, 748 F.2d 854, 857 (4th Cir. 1984); Carlisle v. State, 356 So.2d 702, 703 (Ala.Crim.App. 1978); Ferguson v. State, 488 P.2d 1032, 1038-39 (Alaska 1971); People v. Ratliff, 715 P.2d 665, 676 (Cal. 1986); Jackson v. State, 374 A.2d 1, 2 (Del. 1977), *rev'd on other grounds sub. nom.* Tramill v. State, 425 A.2d 142 (1980); Williams v. State, 395 So.2d 1236, 1238 (Fla. 1981); Hill v. State, 228 S.E.2d 898, 899 (Ga. 1976); Pulley v. State, 382 A.2d 621, 625 (Md. 1978); People v. McGinnis, 262 N.W.2d 669, 671 (Mich. 1978); Young v. State, 451 So.2d 208, 211 (Miss.), *cert. denied,* 469 U.S. 860 (1984); State v. Romesburg, 703 S.W.2d 562, 565 (Mo.Ct.App. 1985); People v. Bacon, 446 N.Y.2d 634, 635 (App.Div. 1981); State v. Hunt, 197 S.E.2d 513, 515 (N.C. 1973); State v. Bridgeman, 366 N.E.2d 1378, 1389 (Ohio 1977), *modified* 381 N.E.2d 184 (1978); Goodwin v. State, 654 P.2d 643, 644 (Okla.Crim.App. 1982); State v. Yielding, 395 P.2d 172, 173 (Or. 1964); Commonwealth v. Brunner, 491 A.2d 150, 152-53 (Pa. 1985); State v. Robbins, 271 S.E.2d 319, 320 (S.C. 1980); Christian v. State, 555 S.W.2d 863, 864 (Tenn. 1977); Jones v. State, 398 S.W.2d 753, 754 (Tex. 1966).

For example, alibi instructions may prevent a jury from mistakenly believing that the defendant has the burden of proving that he was elsewhere, thereby minimizing the prospect of prejudicial error on the point. Such instructions also remind the jury of the main factual dispute it must resolve. Finally, alibi instructions are justified under the general rule that a defendant is entitled to have instructions given on his theory of the case if evidence supports it.[3] It is preferable, when an alibi defense is asserted, to overclarify the law for the jury's benefit, rather than take a chance that the jury is mistaken on a crucial point. Therefore, we conclude that alibi instructions must be given if requested and if defendant's alibi theory is supported by evidence.

Having concluded that the lower court erred by not giving an alibi instruction, we can sustain Duckett's conviction only "if we can say that the error was harmless beyond a reasonable doubt." United States v. Hicks, 748 F.2d 854, 858 (4th Cir. 1984). After consideration of oral argument and the record, we hold that the district court's error was harmless beyond a reasonable doubt. The State produced overwhelming evidence that Duckett committed the crime. For example, Ursula Page testified that, from seven to ten yards away, she saw Duckett running from the murder scene with a rifle. Both Ursula and Latosha testified that they heard their grandparents call out "Tony" immediately before the shootings. And Latosha testified about the altercation, prior to the murder, where Elmo struck Tony in an effort to get him out of the house. Therefore, despite the error, the conviction should be affirmed.

Duckett also argues that, even if the failure to give alibi instructions is not reversible error, he was deprived of a fair trial, a constitutional right guaranteed by the fourteenth amendment. His contention is based upon the fact that during the penalty phase of the trial, despite his counsel's objection, he was compelled to wear jail garb and manacles. He cites Estelle v. Williams, 425 U.S. 501 (1976), and Elledge v. Dugger, 823 F.2d 1439 (11th Cir.), *modified*, 833 F.2d 250 (1987), to support his argument.

In *Estelle*, the United States Supreme Court held "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes." 425 U.S. at 512; *see also* Grooms v. State, 96

---

[3]In Brooks v. State 103 Nev. 611, 747 P.2d 893 (1987), we noted that a defendant was entitled to a "theory of the defense" instruction or "position" instruction that clarifies the law on a crucial issue, even if a positive instruction about the elements of a crime had also been given.

Nev. 142, 605 P.2d 1145 (1980). The Court so concluded "because of the possible impairment of the presumption [of innocence] so basic to the adversary system." 425 U.S. at 504. The Court, however, was only considering the prejudicial impact of a defendant's attire during the guilt-innocence phase of the trial; it did not consider whether a defendant has a similar right during the sentencing phase.

In *Elledge,* the Eleventh Circuit considered whether a defendant was prejudiced by being forced to wear shackles during the sentencing phase of a trial. The court concluded that the Supreme Court's holding in *Estelle* applied not only to the guilt-innocence phase of the trial, but also to the sentencing phase of the trial. The court concluded that before shackling a defendant, a court must consider less restrictive alternatives, and a defendant must be given an opportunity to challenge a decision to shackle. By its ruling, the court apparently created "a per se rule that requires a state trial judge always to hold a hearing before shackling a defendant at the sentencing phase of a bifurcated trial—even when no hearing was requested." 823 F.2d at 1439 (Edmondson, J., dissenting).

After consideration of the arguments advanced in *Estelle, Elledge,* Elledge v. State, 408 So.2d 1021 (Fla. 1982), *vacated and remanded sub nom,* Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987), and Bowers v. State, 507 A.2d 1072 (Md. 1986), we are convinced the lower court did not commit reversible error by refusing Duckett's request to be free of manacles and prison garb during the sentencing phase of the trial.

As noted above, the Supreme Court's holding in *Estelle*—that a defendant has a constitutional right to wear normal apparel at the guilt-innocence phase of trial—was designed to protect the presumption of innocence. However, as repeatedly noted, the presumption no longer applies after a defendant has been convicted. *See* Elledge v. Dugger, 823 F.2d at 1453 (Edmondson, J., dissenting); Elledge v. Dugger, 833 F.2d 250, 250 (1987) (Fay, J., dissenting); Elledge v. State, 408 So.2d at 1022-23; Bowers v. State, 507 A.2d at 1081. As a result, at a sentencing hearing, the constitutional foundation for the *Estelle* right no longer exists, and public safety concerns must be accorded greater significance. Therefore, the decision concerning the necessity for physically restraining a defendant at the penalty stage of the trial must be left to the sound discretion of the trial court. In making this decision, the trial judge must balance state interests—for example, in preserving the safety and security of the courtroom—against the interest in preventing prejudice to the defendant. Unless an abuse of discretion is shown, we will not reverse a sentencing verdict on this issue.

Our review of the record convinces us that the district court did not abuse its discretion in denying Duckett's request to be free of the manacles and jail garb. Duckett, at the sentencing phase of the trial, stood convicted of the callous, brutal murder of his aunt and uncle. Conceivably, after being convicted of two heinous crimes for which the death penalty could have been imposed, Duckett might have concluded that he had nothing to lose from further acts of violence. The state had an important interest in safeguarding people in the courtroom, and we cannot say, on review of the record, that this interest was outweighed by any possible prejudice that might have resulted from the use of manacles. Therefore, abuse of discretion has not been shown.[4]

Finally, Duckett argues that the manner in which the trial judge conducted the trial deprived him of due process. More specifically, he argues that because of the active role the judge took in soliciting testimony from witnesses and commenting to counsel during the course of the trial, the judge tainted the trial atmosphere, ensuring conviction.

It appears the trial judge may have disregarded our counsel in Kinna v. State, 84 Nev. 642, 646-47, 447 P.2d 32, 35 (1968). In *Kinna,* we noted:

> While we are not unmindful of the heavy court calendars of our district courts and the sincere desire of our trial judges to expedite the disposition of cases pending before them, the trial judge's conduct in this case—his display of impatience and active participation during the trial as an advocate— constituted a disregard for the effect such conduct might have upon the jury, who look to the judge as their guide and guardian.
>
> Firmly embedded in our tradition of evenhanded justice— and indeed its very cornerstone—is the concept that the trial judge must, at all times, be and remain impartial. So deeply ingrained is this tradition that it is now well settled that the trial judge must not only be totally indifferent as between the parties, but he must also give the appearance of being so.
>
> Harassment of counsel, prejudicial to his client—and this can take many forms—may require a new trial. The court may not hamper or embarrass counsel in the conduct of the case by remarks or rulings which prevent counsel from presenting his case effectively or from obtaining full and fair consideration from the jury.

---

[4]Because Duckett was convicted and no longer presumed innocent, he had no right to be free of jail garb. Accordingly, *Estelle* does not govern, and the lower court did not err by refusing to grant Duckett's request to wear normal apparel.

Although several of the comments made during Duckett's trial appear, from the record, to be inappropriate, and although judicial questioning of witnesses was overzealous, we are not convinced that Duckett was prejudiced thereby. The trial judge solicited testimony from state and defense witnesses, when both the prosecution and the defense examined, in an apparent attempt to explore matters he felt needed clarification or to expedite the trial. His questioning appeared, from the record, to be even-handed. And the allegedly prejudicial comments he made to defense counsel were, for the most part, outside the presence of the jury. Although we do not condone the manner in which the trial judge proceeded, we do not perceive prejudicial error mandating a new trial.

Duckett's remaining arguments—that the trial court erred by not giving special instructions on eye-witness identification, and that the trial court wrongly instructed the jury not to be influenced by sympathy—were rejected by this court in Nevius v. State, 101 Nev. 238, 699 P.2d 1053 (1985), and need not be reconsidered.

Having determined appellant's arguments to be without merit, we accordingly affirm the judgment of the district court.