Tony DUCKETT, Petitioner–Appellant,

v.

Salvador GODINEZ; Brian McKay,
Respondents–Appellees.

No. 93–17036.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 7, 1995.

Decided Sept. 5, 1995.

John C. Lambrose, Assistant Federal Public Defender, Las Vegas, Nevada, for petitioner-appellant.

John E. Simmons, Deputy Attorney General, Carson City, Nevada, for respondents-appellees.

Before: BRUNETTI, THOMPSON and HAWKINS, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

## OVERVIEW

Tony Duckett is a Nevada state prisoner serving a sentence of life imprisonment without the possibility of parole. He was convicted of burglary and two counts of first-degree murder. He appeals the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He alleges the State of Nevada violated his rights to a fair trial and sentencing hearing because (1) the trial court improperly took an active role in the prosecution of his case; (2) the prosecutor improperly offered his personal opinions to the jury; (3) the trial court failed to give the jury a proposed alibi defense instruction and instructions regarding eyewitness testimony; and (4) he was forced to wear prison clothes and shackles before his sentencing jury.

We have jurisdiction under 28 U.S.C. § 2253. We reject all of Duckett's arguments pertaining to his conviction. We also reject his contention that he was entitled to appointed counsel in his habeas corpus proceeding. We conclude, however, that Duckett's due process rights under the United States Constitution were violated when he was required to appear in shackles in front of his state court sentencing jury. We remand this cause to the district court with instructions to conduct an evidentiary hearing on the issue whether the shackling error was harmless.

## FACTUAL BACKGROUND

On the evening of January 31, 1986, at approximately 9:30 p.m., Elmo and Margaret Armstrong were murdered in the house they shared with their granddaughters Latosha Armstrong and Ursula Page. Each victim suffered several gunshots to the head. At the time of the murders, Latosha and Ursula, approximately eighteen and sixteen years of age, respectively, were present in the home.

At trial, Latosha testified that shortly before the murders, while she and her sister were watching television in the family room, she heard someone knocking loudly on the front door. She then heard a sound like "someone knocking up against a wall." Curious about the noise, Latosha began walking toward the kitchen. As she approached the kitchen, she heard her grandfather say, "Tony," and then her grandmother say, "Tony, what are you doing?" Moments later, she heard four or five gunshots, after which her grandmother exclaimed, "Oh, no. God. Oh, no." Then more shots were fired. At that point, Latosha ran back into the family room and out the side door.

Ursula, who had remained in the family room, testified that she also heard her grandparents call out the name "Tony" before they were shot. Then, when Latosha ran out of the house, Ursula followed her. Ursula testified that, once outside, she "saw a person running in front of my sister, and then I saw my sister, and then I saw a person run past me and behind her." Both people were carrying what apparently were rifles or shotguns. Fearing that her sister would be shot, Ursula screamed. This prompted the person who had run past her to look back over his shoulder. When he did so, Ursula recognized him as her grandfather's nephew, Tony Duckett.

At trial, Duckett argued he had been misidentified. He testified that on the evening of the murders he was with his brother, Kevin Duckett, and his friends, Francis Gilkey and Brenda Montgomery, ingesting cocaine and marijuana at Gilkey's home. He claimed that he and Kevin had arrived at Gilkey's home around 8:30 p.m. and, although Kevin left earlier, he remained until after 10:00 p.m. Duckett's brother and friends testified on his behalf as alibi witnesses.

The jury convicted Duckett of one count of burglary and two counts of first-degree murder, and sentenced him to life without the possibility of parole. Duckett appealed to the Nevada Supreme Court, which affirmed his conviction in *Duckett v. State,* 104 Nev. 6, 752 P.2d 752 (1988).

■ Duckett did not seek collateral review in the Nevada courts. Instead, he filed a habeas corpus petition in the United States District Court for the District of Nevada

under 28 U.S.C. § 2254.[1] The district court denied the petition and this appeal followed.

## STANDARD OF REVIEW

■ We review de novo a district court's decision to deny a petition for habeas corpus. *Sanders v. Ratelle,* 21 F.3d 1446, 1451 (9th Cir.1994).

## DISCUSSION

### I. Judicial Misconduct

Duckett argues he was denied a fair trial because the state trial court judge actively participated in the prosecution of his case and showed open hostility to the defense. He points to various instances throughout his trial in which the trial judge, Judge Goldman, intervened in the examination of prosecution witnesses, sometimes interjecting specific questions and other times taking over the questioning altogether. In several of these instances, the judge elicited testimony which was helpful to the prosecution and detrimental to the defense. Duckett also complains that the trial judge's overall attitude toward defense counsel and witnesses was hostile and sarcastic, and demonstrated a lack of impartiality.

■ The appropriate role for a judge to play in a jury trial has been the subject of a number of appeals. We have said a trial judge must always remain fair and impartial. *Kennedy v. Los Angeles Police Dep't,* 901 F.2d 702, 709 (9th Cir.1989). He " 'must be ever mindful of the sensitive role [the court] plays in a jury trial and avoid even the appearance of advocacy or partiality.' " *Id.* (quoting *United States v. Harris,* 501 F.2d 1, 10 (9th Cir.1974)). At the same time, however, we have recognized that a trial judge is "more than an umpire." *United States v. Laurins,* 857 F.2d 529, 537 (9th Cir.1988), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989). It is perfectly appropriate for a judge to "take part where necessary to clarify testimony and assist the jury in understanding the evidence." *United States v. De Sisto,* 289 F.2d 833, 834 (2d Cir.1961). *See also Laurins,* 857 F.2d at 537 (trial judge "may participate in the examination of witnesses to clarify evidence, confine counsel to evidentiary rulings, ensure the orderly presentation of evidence, and prevent undue repetition"); *United States v. Mostella,* 802 F.2d 358, 361 (9th Cir.1986) (same); *United States v. Poland,* 659 F.2d 884, 893 (9th Cir.) (finding questions calculated to make testimony clearer to jury not improper), *cert. denied,* 454 U.S. 1059, 102 S.Ct. 611, 70 L.Ed.2d 598 (1981).

■ In this case, the Nevada Supreme Court found that several of Judge Goldman's comments were "inappropriate" and his questioning of witnesses was at times "overzealous." *Duckett v. State,* 104 Nev. 6, 752 P.2d 752, 756 (1988). Nonetheless, that court determined the error, if any, was not prejudicial. *Id.* The district court, in denying Duckett's habeas corpus petition, concluded that Judge Goldman's conduct did not rise to the level of a constitutional violation and, therefore, did not require reversal of Duckett's conviction.[2]

---

1. Duckett was not required to seek postconviction relief in state court before filing his federal habeas petition, because all the issues he raised in the federal petition were presented to and decided by the state court in his direct appeal. *See Castille v. Peoples,* 489 U.S. 346, 350, 109 S.Ct. 1056, 1059, 103 L.Ed.2d 380 (1989) ("[O]nce the state courts have ruled upon a claim, it is not necessary for a petitioner 'to ask the state for collateral relief, based on the same evidence and issues already decided by direct review,' " in order to exhaust his state remedies.) (quoting *Brown v. Allen,* 344 U.S. 443, 447, 73 S.Ct. 397, 402, 97 L.Ed. 469 (1953)).

2. Duckett contends both the Nevada Supreme Court and the district court applied the wrong standard of review. He argues that, instead of

asking whether Judge Goldman's intervention in the case influenced the jury's verdict or was harmless error, both courts determined there was sufficient evidence to convict and, therefore, the judge's actions—while erroneous—did not require reversal.

Duckett is mistaken. Both the state supreme court and the district court applied the correct standard. The district court found there was no error of constitutional magnitude and, for that reason, it was not required to engage in harmless error analysis. The Nevada Supreme Court determined that the judge's questioning of witnesses, while "overzealous," was not prejudicial because it was evenhanded. *Duckett v. State,* 752 P.2d at 756. In other words, the error, if any, was harmless beyond a reasonable doubt.

■ We agree with the district court. In reviewing cases on direct appeal, in the exercise of our supervisory powers over the district courts, we have stated that "[t]he standard for reversing a verdict because of general judicial misconduct during trial is rather stringent." *Kennedy*, 901 F.2d at 709. To sustain a claim of this kind, there must be an "extremely high level of interference" by the trial judge which creates "a pervasive climate of partiality and unfairness." *United States v. DeLuca*, 692 F.2d 1277, 1282 (9th Cir. 1982). *See also Laurins*, 857 F.2d at 537 ("A judge's participation [in the trial] justifies a new trial only if the record shows actual bias or leaves an abiding impression that the jury perceived an appearance of advocacy or partiality.").

■ Because this case comes to us in the posture of a habeas appeal, the question is not simply whether the trial judge committed judicial misconduct or whether we, in our supervisory capacity over the district courts, would reverse a conviction obtained after a trial in which a federal judge behaved in the same manner. Rather, we must ask whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution. *Gayle v. Scully*, 779 F.2d 802, 806 (2d Cir.1985), *cert. denied*, 479 U.S. 838, 107 S.Ct. 139, 93 L.Ed.2d 82 (1986); *McBee v. Grant*, 763 F.2d 811, 818 (6th Cir.1985).

■ Several instances of judicial intervention of which Duckett complains were clearly appropriate even by the standard we apply on direct review. For example, when testimony by a prosecution witness involved the lifting of latent fingerprints, Judge Goldman interrupted and asked the witness to "tell the members of the jury what a latent fingerprint is." When a police officer testified that a photograph presented by the prosecutor was a fair and accurate representation of the crime scene, the judge had the officer clarify that he had observed the scene from a different angle. On another occasion, Judge Gold-

man asked one of the state's expert witnesses to explain the difference between casings, bullets and slugs, and the distinction between the methods of operation of semi-automatic and single-action weapons. And, when the prosecutor asked Latosha about the location of street and porch lights at or near her grandparents' house, the judge interrupted to clarify whether the lights were on or off on the night of the murders. In each of these instances, Judge Goldman acted properly to clarify the evidence for the jury. The fact that his questions may have permitted a witness to emphasize testimony helpful to the prosecution, or elicited answers detrimental to the defense, is not determinative. *Daye v. Attorney General of New York*, 712 F.2d 1566, 1572 (2d Cir.1983), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984).

■ The judge's behavior at other points in the proceedings is more troubling. For example, during Ursula's direct examination, he took over the questioning on behalf of the state to lay the foundation which would qualify Ursula to testify regarding whether Duckett was in the habit of entering the Armstrong home through the front or side doors. Then, at the conclusion of Ursula's testimony, the judge asked her to specify the exact distance on the night of the murders between her and the person she identified as Duckett, tested her ability to gauge distances and, *sua sponte*, directed the court clerk to dim the lights in the courtroom to simulate the lighting conditions Ursula remembered from the night of the murders. The judge expressed clear frustration and hostility toward Kevin Duckett when, during Kevin's cross-examination, he repeatedly directed him to "answer my question" and then warned, "Don't argue with me. There is no one in this room tougher than me now." Finally, during defense counsel's questioning of Tony Duckett, the judge told the prosecution to "once in a while throw in an objection for the heck of it." [3]

---

3. Judge Goldman also ordered Duckett's key alibi witness, Francis Gilkey, to remain in the courtroom after her testimony. After the jury was dismissed, the judge asked Gilkey if she had recently ingested narcotics and, when she admit-

ted that she had, he placed her in custody. The district court properly found:

> Since all of this occurred outside the presence of the jury, no prejudice could have resulted from the trial judge's actions. While the jury

We assume, solely for the purpose of this analysis, that if a judge in federal court behaved in this manner we might be inclined to exercise our supervisory powers on direct appeal and remand for a new trial. *But see Mostella,* 802 F.2d at 362 (judge's excessive questions and sarcastic comments did not amount to "extreme overstepping of his proper judicial role"—conviction affirmed); *Poland,* 659 F.2d at 894 (finding trial judge's impatience with defense, displays of irritation, and use of sarcasm, while inappropriate, were not prejudicial).

■■■■ This case, however, does not involve behavior of a federal court judge. While we do not approve of Judge Goldman's conduct, as a federal court we have no supervisory authority over criminal proceedings in state courts. The only standards we can impose on the states are those dictated by the Constitution. *Daye,* 712 F.2d at 1571. Objectionable as some of Judge Goldman's actions might be, when considered in the context of the trial as a whole they are not "of sufficient gravity to warrant the conclusion that fundamental fairness has been denied." *Id.* at 1572. *See Gayle v. Scully,* 779 F.2d at 807 (trial judge's caustic, sarcastic comments and offensive conduct, although perhaps inconsistent with institutional standards of federal courts, did not violate due process); *Daye,* 712 F.2d at 1572 (trial judge's skeptical attitude toward defendant's testimony, and his reinforcement of identification evidence by government witnesses, "approached but did not cross the line that permits [a ruling] that the Constitution has been violated").

Duckett also argues that, at the time of his trial, Judge Goldman was "disabled" and therefore incompetent to perform the duties of a judge. In support of this argument, Duckett cites *Goldman v. Nevada Comm'n on Judicial Discipline,* 108 Nev. 251, 830 P.2d 107 (1992), a case in which the Nevada Supreme Court rejected Judge Goldman's request for a disability pension. *Id.,* 830 P.2d at 120. Duckett contends Judge Goldman's recitation of physical and mental disabilities in support of his bid for a pension

constitutes an admission that he was unfit to act in a judicial capacity at the time he presided over Duckett's trial.

■■■■ We may take judicial notice of proceedings in other courts, whether in the federal or state systems. *United States ex rel. Robinson Rancheria v. Borneo, Inc.,* 971 F.2d 244, 248 (9th Cir.1992). Duckett's reliance on *Goldman,* however, is unavailing. Judge Goldman's perception of his ability to act as a judge is irrelevant to this case. The issue is whether his behavior during Duckett's trial rendered the trial fundamentally unfair under the Constitution. It did not.

## II. Prosecutorial Misconduct

Duckett contends his constitutional rights were violated by the prosecutor's misconduct during trial.

Duckett presented his claim of prosecutorial misconduct both to the Nevada Supreme Court and to the district court. Oddly, neither court addressed the claim. *See Duckett v. State,* 752 P.2d at 753. Duckett asks us to order a remand to resolve the issue. The state argues that, while it is true the district court did not specifically discuss Duckett's prosecutorial misconduct claim, the claim was nonetheless considered and rejected because in its order denying the petition for writ of habeas corpus, the district court stated generally that "the issues have been considered." The state construes this statement as a decision on the merits of all the claims presented in the petition, including the prosecutorial misconduct claim.

We need not decide whether the district court's order disposed of Duckett's prosecutorial misconduct claim on the merits, because Duckett is clearly not entitled to habeas relief on this basis in any event. In his first amended petition, Duckett complained of two types of misconduct, each occurring during the prosecutor's closing argument. First, he argued the prosecutor presented evidence outside the record when he told the jury, "Elmo and Margaret Armstrong said [Duckett] committed the act," and when he speculated the murderers had intended to

---

might have noticed that the witness was not excused, nothing in the judge's manner indi-

cated he was casting doubt on the veracity of that witness.

rob the victims but did not do so because they were surprised by the other occupants of the house. Second, Duckett contended the prosecutor improperly vouched for the veracity of government witnesses and attacked the credibility of witnesses for the defense.

■ The prosecutor did not refer to evidence outside the record. Taken in context, his comment about the Armstrongs was clearly a reference to the fact that both victims uttered the name "Tony" before they were killed. The comment was squarely supported by the evidence. Both Latosha and Ursula testified that they heard their grandparents say "Tony" before they were shot.

■ Similarly, the prosecutor's attempt to explain why nothing was stolen from the victims, given his theory that Duckett killed them for their money, was a permissible inference drawn from the evidence. *See United States v. Necoechea*, 986 F.2d 1273, 1279 (9th Cir.1993) (inference from evidence in record not reference to extra-record facts).

■ Nor did the prosecutor improperly bolster the credibility of the state's witnesses or impugn the credibility of witnesses for the defense. The prosecutor's assertions regarding the relative believability of the state and defense witnesses were not representations of his personal opinion, but inferences drawn from the evidence. With respect to the state's witnesses, the prosecutor told the jury:

Let's look at the witnesses in this case. The State's witnesses, the original officers on the scene, did they have a motive to get up there and say anything other than what they did? No. Dr. Green, Dr. Hollander, professional people. They came in and testified as to what they did. The officers are professional people. They came in and testified to exactly what they did, and the facts that they heard and saw, and procedures that they followed.

Latosha Armstrong and Ursula Page, do they have a motive? One motive, come in here and to tell the truth and see the executioner of their grandparents receive justice. You saw their demeanor from the witness stand. You saw Latosha get up here and testify exactly what she saw and

what she did. You saw the demeanor of Ursula Page, 16 years old, get on this witness stand, after she had just been threatened down the hallway by the defendant's brother, still get on this witness stand and testify without blinking an eye, pointing that finger at Tony Duckett, saying, "That is the person I saw running down the street." Credible? Totally. Believable? Totally. Motive? One, bringing him to justice.

■ On direct review of appeals from the federal district courts, we have found similar comments not inappropriate. *See United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir.1991) ("Who's lying? Is Special Agent Reyes lying? Did he get up on the stand under oath and lie to you for the sole purpose of convicting an innocent man? It's unbelievable."); *United States v. Necoechea*, 986 F.2d at 1279 ("Why ... if [Gibson's] lying, isn't she doing a better job of it? I submit to you ... that she's not lying. I submit to you that she's telling the truth."). Prosecutorial conduct that would pass muster on direct review of a federal court conviction, *a fortiori* passes muster on review of a state court conviction in a habeas proceeding. *See Gayle*, 779 F.2d at 806 (alleged judicial misconduct).

■ The prosecutor also suggested certain defense witnesses had been untruthful:

Bring in Ernest Jackson, Jr., put him up here. "Did you rehearse your story with anybody?" "No, not at all." "Talk to anybody?" "Not at all. I didn't say anything." The problem is they didn't know there was another Deputy District Attorney sitting in the hallway whose sole job it was to listen to these two people preparing their testimony. Believable? Credible? Incredible was their story.

Here, the prosecutor was referring to the testimony of a state witness, a deputy district attorney, who had testified he heard two defense witnesses reviewing, immediately outside the courtroom, the relative timing of certain television programs on the night of the murders. Apparently, the defense hoped to establish, by reference to the television programs, the precise time Duckett was

present in the Gilkey home that evening. There was nothing improper about the prosecutor's inference that the defense witnesses lied when they testified they had not rehearsed their testimony regarding the television programs. It was clearly a comment on the evidence.

 The only conceivably improper argument made by the prosecutor was the following:

> Don't get caught up in the games. I mean I have been accused, or I felt I was accused of improperly doing my job because I questioned witnesses who sat here in this chair, questioned witnesses who I felt were lying.

Here, the prosecutor may have injected his own belief regarding the veracity of the witnesses. However, Duckett is not entitled to relief based on this one comment by the prosecutor. Assuming it was improper, the comment did not deprive Duckett of a fair trial. It was an "isolated moment[ ]" in a lengthy trial, in which the jury was clearly instructed that statements made by attorneys during closing argument were not evidence to be considered in deciding the facts. *Hall v. Whitley*, 935 F.2d 164, 166 (9th Cir. 1991). As we have stated before: this is a habeas corpus proceeding in which a state court conviction is challenged as violating the federal Constitution. On a petition for a writ of habeas corpus, the standard of review for a claim of prosecutorial misconduct, like the standard of review for a claim of judicial misconduct, is " 'the narrow one of due process, and not the broad exercise of supervisory power.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. De-Christoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)). "The relevant question is whether the prosecutor['s] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Id.* (quoting *Donnelly*, 416 U.S. at 643, 94 S.Ct. at 1871). We conclude they did not.

## III. Jury Instructions

Duckett asked the trial court to instruct the jury on his alibi defense and the vagaries of eyewitness testimony. He offered an alibi defense instruction and two alternative eyewitness testimony instructions, all of which the trial court rejected. He claims the trial court's refusal to give the proffered instructions violated his right to due process and a fair trial.

Because Duckett did not include his claim regarding the eyewitness testimony instructions in his habeas petition in the district court, and the district court did not address that issue, we decline to consider it in this appeal. *See Willard v. California*, 812 F.2d 461, 465 (9th Cir.1987).

 With regard to Duckett's proposed alibi instruction, there is no doubt that "failure to instruct the jury on the defendant's theory of the case, where there is evidence to support such instruction, is reversible per se and can never be considered harmless error." *United States v. Zuniga*, 6 F.3d 569, 571 (9th Cir.1993). *See also United States v. Escobar de Bright*, 742 F.2d 1196, 1202 (9th Cir.1984). However, "it is *not* reversible error to reject a defendant's proposed instruction on his theory of the case if other instructions, in their entirety, adequately cover that defense theory," *United States v. Mason*, 902 F.2d 1434, 1438 (9th Cir.1990) (emphasis added).

The state argues that the jury instructions given by the trial court, taken as a whole, adequately covered Duckett's alibi defense. The jury was instructed it was to presume Duckett innocent until it was persuaded the state had proved his guilt beyond a reasonable doubt. The jury was also instructed on all of the elements of the charged offenses, and told the prosecution had the burden to prove each element beyond a reasonable doubt. Implicit in these instructions is the requirement that the prosecution had to prove beyond a reasonable doubt that Duckett was present at the scene of the crime and committed the charged acts.

 As Duckett argues, however, in our circuit we have held that, when a specific alibi instruction is requested, it must be given. *United States v. Hairston*, 64 F.3d 491, 494 (9th Cir.1995); *United States v. Ragghianti*, 560 F.2d 1376, 1379 (9th Cir.1977). We have warned that instructions on the

presumption of innocence, the government's burden of proving every element of the crime beyond a reasonable doubt, and the identification of the defendant as the perpetrator of the charged crime are not adequate substitutes for a specific alibi instruction. *United States v. Zuniga,* 6 F.3d at 570–71. *See also United States v. Hoke,* 610 F.2d 678, 679 (9th Cir.1980). In *Zuniga,* we said that "[a]n alibi instruction is critical" because, without it, there is a danger that the jury may interpret the defendant's failure to prove his alibi as proof of guilt. *Zuniga,* 6 F.3d at 570. On the basis of these precedents, Duckett argues the state trial court's failure to give the jury his specific alibi instruction mandates automatic reversal of his conviction, without regard to the content of the remaining jury instructions and the effect of the missing instruction on the trial as a whole.

Duckett's reliance on the above precedents is misplaced. Each of these cases reached our court in the posture of a direct appeal from a federal court conviction. Once again, we emphasize that in reviewing cases on direct appeal, in our supervisory capacity over the district courts, we may require the district courts to "follow procedures deemed desirable from the viewpoint of sound judicial practice although in no wise commanded ... by the Constitution." *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

 The fact that a jury instruction is inadequate by Ninth Circuit direct appeal standards does not mean a petitioner who relies on such an inadequacy will be entitled to habeas relief from a state court conviction. *Estelle v. McGuire,* 502 U.S. 62, 71–72, 112 S.Ct. 475, 481–482, 116 L.Ed.2d 385 (1991). In habeas proceedings challenging state court convictions, relief is available only for *constitutional* violations. We have never held, as Duckett would have us do here, that failure to give a specific alibi instruction is necessarily a *constitutional* violation. Nor has any other circuit.

Virtually every federal appellate court case in which it has been held that the trial court erred by failing to give an alibi instruction was a case on direct appeal from a district court. We are aware of only one federal appellate case in which the failure to give an alibi instruction was considered in the context of a habeas corpus proceeding alleging constitutional error by a state court. There, the Seventh Circuit rejected the petitioner's contention that the trial court committed constitutional error in failing to instruct the jury on his alibi defense. *Alicea v. Gagnon,* 675 F.2d 913, 926 (7th Cir.1982). That court held that, because the jury was instructed that the prosecution had to prove the defendant's presence at the scene of the crime beyond a reasonable doubt, "nothing would have been added by instructing that his absence would require acquittal." *Id.* "Because such an instruction would have been redundant," there was no error in its omission.[4] *Id.*

The Eighth Circuit has held on direct appeal that, under some circumstances, it is error for a trial court to refuse to give an alibi defense instruction. *Compare United States v. Dawn,* 897 F.2d 1444, 1450 (8th Cir.) (finding no error), *cert. denied,* 498 U.S. 960, 111 S.Ct. 389, 112 L.Ed.2d 400 (1990), *with United States v. Webster,* 769 F.2d 487, 490 (8th Cir.1985) (finding error). However, even when the Eighth Circuit has held that the failure to give an alibi instruction was error, it has subjected the error to harmless error review. *United States v. Webster,* 769 F.2d at 490–91. *See also United States v. Dawn,* 897 F.2d at 1450; *United States v. Agofsky,* 20 F.3d 866, 872 (8th Cir.), *cert. denied,* —— U.S. —— and —— U.S. ——, 115 S.Ct. 280 and 115 S.Ct. 363, 130 L.Ed.2d 196 and 130 L.Ed.2d 316 (1994). According to the Eighth Circuit—at least when an alibi defense is argued to the jury, the jury is instructed on the government's burden of proving every element of the crime beyond a

---

4. Unlike the Ninth Circuit, the Seventh Circuit has also held on direct appeal that, when the jury is properly instructed regarding the presumption of innocence, the burden of proof, and the elements of the offense—including the need to prove the defendant was present and committed the acts constituting the crime—there is no error in failing to specifically instruct on the alibi defense. *United States v. Carter,* 910 F.2d 1524, 1531 (7th Cir.1990), *cert. denied,* 499 U.S. 978, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991).

reasonable doubt, and the evidence of guilt is relatively strong—failure to instruct on an alibi defense, assuming for the sake of argument that it is erroneous, is nonetheless harmless. *United States v. Dawn*, 897 F.2d at 1450; *United States v. Agofsky*, 20 F.3d at 872; *United States v. Webster*, 769 F.2d at 490–91.

The Second, Third, Fourth and Fifth Circuits, like our circuit, have all held in cases arising on direct appeal from the district courts that it is always reversible error for a federal trial court not to instruct on an alibi defense when a specific alibi instruction is requested and there is some evidence in the record to support it. *See United States v. Burse*, 531 F.2d 1151, 1153 (2d Cir.1976); *United States v. Simon*, 995 F.2d 1236, 1243 (3d Cir.1993); *United States v. Booz*, 451 F.2d 719, 723–24 (3d Cir.1971) (citing *United States v. Barrasso*, 267 F.2d 908, 910–11 (3d Cir.1959)); *United States v. Hicks*, 748 F.2d 854, 858 (4th Cir.1984); *United States v. Megna*, 450 F.2d 511, 513 (5th Cir.1971). These circuits seem to agree that the error cannot be cured by general instructions regarding the burden of proof and the presumption of innocence. *See United States v. Burse*, 531 F.2d at 1153; *United States v. Simon*, 995 F.2d at 1243–44; *United States v. Booz*, 451 F.2d at 723; *United States v. Marcus*, 166 F.2d 497, 503–04 (3d Cir.1948). But, is the error of constitutional magnitude?

The Third Circuit plainly has said the rule requiring a specific alibi instruction is "nonconstitutional in nature." *United States v. Simon*, 995 F.2d at 1244. The Second and Fifth Circuits, like our circuit, have not indicated whether failure to instruct on an alibi defense is constitutional error. *United States v. Burse*, 531 F.2d at 1153; *United States v. Megna*, 450 F.2d at 513. Only the Fourth Circuit has held that a trial court's failure to give a specific alibi instruction, when there is some specific evidence to support it, is "an error of constitutional magnitude." *United States v. Hicks*, 748 F.2d at 858.

We have carefully examined our decisions in *Ragghianti, Zuniga, Hoke,* and *Hairston,* and conclude these decisions do not impose upon the states of this circuit a constitutional requirement that a specific alibi instruction must be given whenever such an instruction is requested and there is evidence in the record to support it.

This is not to say, however, that the failure to give a requested alibi instruction in a state prosecution can never be a denial of federal due process. Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury. *See Cupp v. Naughten*, 414 U.S. at 147, 94 S.Ct. at 400–401 (constitutionality determined not by focusing on ailing instruction "in artificial isolation" but by considering effect of instruction "in the context of the overall charge."). *See also Henderson v. Kibbe*, 431 U.S. 145, 155, 97 S.Ct. 1730, 1737, 52 L.Ed.2d 203 (1977) (recognizing that "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law" and, therefore, a habeas petitioner whose claim of error involves the failure to give a particular instruction bears an "especially heavy" burden).

In the present case, the jury was instructed on every element of the crimes of robbery and murder. The jury was also told that "the defendant is presumed to be innocent until the contrary is proved," and "[t]his presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that *the defendant is the person who committed the offense.*" (emphasis added).

These instructions properly told the jury the state bore the burden of proving beyond a reasonable doubt Duckett's presence at the scene of the crime.[5] Because the state bore this burden, Duckett clearly did not bear the burden of proving his absence from the scene.

It is also significant that the defense's closing argument focused heavily on the alibi

---

**5.** Duckett argues the reasonable doubt instruction was constitutionally inadequate. Because he did not raise this claim before either the

Nevada Supreme Court or the district court, this issue is not properly before us and we do not consider it.

defense. *See United States v. Dawn*, 897 F.2d at 1450; *United States v. Agofsky*, 20 F.3d at 872; *United States v. Webster*, 769 F.2d at 490–91. Duckett's trial counsel argued to the jury that although the state bore the burden of proof and, therefore, Duckett was not required to present a defense, he had in fact presented one. His counsel then recounted to the jury the testimony of Duckett's alibi witnesses, and reminded the jury that "the issue to keep your eye on is reasonable doubt. Is there a reasonable doubt that Tony was at [the Armstrong home] at 9:30 on that Friday night, or was he a mile away at Francis's house smoking some dope?"

Considering all the evidence presented at the trial, Duckett's alibi evidence was relatively weak in relation to the prosecution's case. His alibi witnesses presented conflicting testimony regarding the precise time Duckett was at the Gilkey home on the night of the murders, and those witnesses admitted they had been smoking marijuana. On the prosecution's side, both Latosha and Ursula testified they heard their grandparents utter the name "Tony" before they were shot, and Ursula—who is Duckett's cousin—positively identified him as the man she saw running from the murder scene.

We conclude that on the evidence and the overall instructions given to the jury, Duckett was afforded a fair trial. His requested alibi instruction was not given, but the instructions as a whole, in light of all of the evidence in the case, were sufficient to afford due process under the standard by which we review state court convictions in habeas cases under 28 U.S.C. § 2254. The question we ask is whether there was a violation of the United States Constitution. We ask whether, under the instructions as a whole and given the evidence in the case, the failure to

give the requested instruction rendered the trial so fundamentally unfair as to violate federal due process. *Cupp v. Naughten*, 414 U.S. at 147, 94 S.Ct. at 400–401. Here, it did not. There was no constitutional violation.

## IV. Shackles and Prison Clothes at Sentencing

Duckett appeared for his sentencing hearing dressed in prison clothes and wearing handcuffs and a security chain. His prison clothing consisted of white tennis shoes with blue stripes, dark pants and a "service station type" shirt. Before the hearing began, Duckett's counsel objected to his client appearing before the jury in prison dress and shackles. The trial court overruled the objection, pointing out that Duckett was "guilty of two counts of murder in the first degree with use of [a] deadly weapon, among other things." Duckett argues that requiring him to wear prison clothes and shackles during his sentencing hearing was inherently prejudicial and violated his right to due process.

The claim Duckett raises presents a question of first impression in this circuit.[6] Although a number of cases have dealt extensively with the constitutionality of requiring a defendant to wear prison clothes and shackles during the *guilt* phase of trial, only the Eleventh Circuit has addressed the constitutionality of shackling during the *sentencing* phase of trial, and no court has considered the constitutional implications of requiring a defendant to wear prison clothing during sentencing. *See Elledge v. Dugger*, 823 F.2d 1439 (11th Cir.1987).

We hold, drawing upon the reasoning of cases which have dealt with these issues in the trial context, that requiring a defendant to wear prison clothes during sentencing is ·not prejudicial and does not violate due pro-

**6.** The state urges that we not reach the merits of this claim because granting Duckett the relief he seeks would require creating a "new rule" of constitutional law under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion). We decline to consider the state's *Teague* argument because the state did not raise the issue in the district court. When *Teague* is raised for the first time on appeal, the court of appeals has discretion to consider the issue waived. *Jordan v. Ducharme*, 983 F.2d 933, 935 (9th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct.

216, 126 L.Ed.2d 172 (1993). *See also Godinez v. Moran*, —— U.S. ——, —— n. 8, 113 S.Ct. 2680, 2685 n. 8, 125 L.Ed.2d 321 (1993) (declining to consider *Teague* because it was not raised in either lower courts or petition for *certiorari*); *Schiro v. Farley*, —— U.S. ——, ——–——, 114 S.Ct. 783, 788–89, 127 L.Ed.2d 47 (1994) (same); *Boardman v. Estelle*, 957 F.2d 1523, 1534 (9th Cir.) (finding *Teague* waived because it was not raised until the petition for rehearing), *cert. denied*, —— U.S. ——, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992).

cess. However, we hold that shackling a defendant during a sentencing hearing before a jury is an inherently prejudicial practice which comports with due process only when used as a last resort to protect an essential state interest—such as maintaining public safety or assuring the decorum of the proceedings.

In this case, the record does not indicate any compelling reason for shackling Duckett during his sentencing hearing. Therefore, we conclude his constitutional rights were violated when he was forced to appear in shackles before the sentencing jury. Because the record is not sufficiently developed to enable us to determine whether or not this constitutional error was harmless, we remand this question to the district court for an evidentiary hearing.

### A. Prison Clothes

The first issue Duckett presents is whether his fundamental right to a fair sentencing hearing was violated when the trial court forced him to appear before the sentencing jury dressed in prison clothing.

■ It is clear that a court cannot, without violating the Due Process Clause, compel an accused to wear identifiable prison clothing during his trial. *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). This is because the practice furthers no essential state interest, and "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment" and impair the presumption of innocence, which is "a basic component of a fair trial under our system of criminal justice." *Id.* at 503, 504–05, 96 S.Ct. at 1692–93, 1693–94.

■ The presumption of innocence, however, no longer applies in the penalty phase of a bifurcated trial. At the penalty phase, the defendant stands convicted. His condition as a prisoner is no surprise to the jury, which just found him guilty. Prison clothing cannot be considered inherently prejudicial when the jury already knows, based upon other facts, that the defendant has been deprived of his liberty. *See Estelle v. Williams*, 425 U.S. at 507, 96 S.Ct. at 1694

(recognizing that "[n]o prejudice can result from seeing that which is already known") (quotations and citations omitted); *United States v. Stewart*, 20 F.3d 911, 916 (8th Cir. 1994) (holding that when circumstances permit shackling defendant during trial, compelling defendant also to wear prison clothing is not inherently prejudicial because his condition as a prisoner is already apparent to the jury); *United States ex rel. Stahl v. Henderson*, 472 F.2d 556, 556–57 (5th Cir.) (holding that, where defendant was charged with murdering another prisoner while confined in prison, no prejudice resulted from trying him in jail clothes), *cert. denied*, 411 U.S. 971, 93 S.Ct. 2166, 36 L.Ed.2d 694 (1973).

■ We conclude the fact Duckett was compelled to wear prison clothing at his sentencing hearing could not have undermined the fairness of that proceeding, because the jury already knew—based on the trial in which it had participated and the verdict it had rendered—Duckett was a convicted murderer.

### B. Shackles

The analysis regarding the constitutionality of shackling is different. Unlike the Supreme Court's reasoning regarding prison clothes, its rationale in shackling cases has not been grounded only in the presumption of innocence. *See Elledge v. Dugger*, 823 F.2d at 1451 (recognizing that "the Supreme Court has not bottomed the prohibition against shackling on the presumption of innocence alone"). *But see id.* at 1454 (Edmondson, J., concurring in part and dissenting in part) (arguing that the presumption of innocence is "the single major analytical thrust" of the shackling cases).

In *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970), the Court recognized two additional "inherent disadvantages" to shackling a defendant at trial: physical restraints may not only cause jury prejudice and impair the presumption of innocence, they may also detract from the dignity and decorum of the proceeding and impede the defendant's ability to communicate with his counsel. *Id.* "The lower courts have observed two further weaknesses in

imposing physical restraints: they may confuse and embarrass the defendant, thereby impairing his mental faculties; and they may cause him pain." *Spain v. Rushen,* 883 F.2d 712, 720–21 (9th Cir.1989) (citing cases from other circuits), *cert. denied,* 495 U.S. 910, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).

■ With the exception of the presumption of innocence, these "inherent limitations" of shackling continue into the penalty stage of a trial. Because "there seems to be no reason to restrict the[se] principles to the guilt-innocence stage of trial," we conclude the constitutional rules regarding shackling at trial apply equally in the sentencing context. *Elledge v. Dugger,* 823 F.2d at 1451.

This conclusion is supported by analogy to the treatment of the shackling issue in civil cases. There, the presumption of innocence does not apply. Nonetheless, relying on criminal case precedents, courts have held that when an individual's level of dangerousness is a question the jury must decide in a civil proceeding, it is a violation of the right to a fair trial to compel that individual to appear before the jury bound in physical restraints. *See, e.g., Tyars v. Finner,* 709 F.2d 1274, 1284–85 (9th Cir.1983) (unconstitutional to compel the subject of a civil commitment hearing to wear physical restraints at trial); *Lemons v. Skidmore,* 985 F.2d 354, 356–58 (7th Cir.1993) (impermissible to shackle plaintiff prison inmate in a civil rights action alleging excessive force by corrections officers). *Cf. Holloway v. Alexander,* 957 F.2d 529, 530 (8th Cir.1992) (constitutional to shackle plaintiff prison inmate in civil rights action challenging constitutionality of living conditions in state prison, because plaintiff's status as dangerous felon irrelevant).

■ In the penalty phase of a capital trial, the jury knows the defendant is a convicted felon. But the extent to which he continues to be dangerous is a central issue the jury must decide in determining his sentence. "[N]ot all convicted felons are so dangerous and violent that they must be brought to court and kept in handcuffs and leg irons." *Lemons v. Skidmore,* 985 F.2d at 357. Unlike prison clothes, physical restraints may create the impression in the minds of the jury that the court believes the defendant is a particularly dangerous and violent person. Therefore, in the absence of a compelling need to shackle the defendant during his sentencing hearing, such a practice is inherently prejudicial.

■ The right to appear before a jury free of shackles, however, is not absolute. *Wilson v. McCarthy,* 770 F.2d 1482, 1484–85 (9th Cir.1985). Shackling is inherently prejudicial, but it is not per se unconstitutional. *See Spain v. Rushen,* 883 F.2d at 716. Under certain circumstances, "shackling ... may be appropriate because of the public's competing interest in courtroom security and the just administration of law." *Id.* at 722 (citing *Illinois v. Allen,* 397 U.S. at 344, 90 S.Ct. at 1061). Because of the potential for prejudice, however, due process requires that shackles be used only as a "last resort." *Illinois v. Allen,* 397 U.S. at 344, 90 S.Ct. at 1061.

■ In this circuit, it is a denial of due process if a trial court orders a defendant shackled without first engaging in a two-step process. *Castillo v. Stainer,* 983 F.2d 145, 147–48 (9th Cir.1992), *as amended by,* 997 F.2d 669 (9th Cir.1993). "First, the court must be persuaded by compelling circumstances 'that some measure [is] needed to maintain security of the courtroom.'" *Jones v. Meyer,* 899 F.2d 883, 885 (9th Cir.) (quoting *Spain v. Rushen,* 883 F.2d at 720), *cert. denied,* 498 U.S. 832, 111 S.Ct. 95, 112 L.Ed.2d 67 (1990). "Second, the court must 'pursue less restrictive alternatives before imposing physical restraints.'" *Id.* (quoting *Spain,* 883 F.2d at 721). *See also United States v. Baker,* 10 F.3d 1374, 1401 (9th Cir.1993). In this case, the state trial court did not abide by either criteria.

■ The state trial court summarily overruled Duckett's objection to the shackles. There is no indication in the record that the court considered whether any less restrictive alternatives were available and would be adequate. The court's only stated reason for requiring Duckett to appear in shackles during the penalty phase of the case was that he

had just been convicted of two counts of murder.

 A defendant's status as a convicted felon may justify a trial judge's concern for security. *Wilson v. McCarthy,* 770 F.2d at 1482. Standing alone, however, this is not sufficient reason to impose physical restraints. *Rhoden v. Rowland,* 10 F.3d 1457, 1458 (9th Cir.1993). *See also State v. Young,* 853 P.2d 327, 350–51, 351 n. 97 (Utah 1993) (holding that a murder conviction alone is not a sufficient basis for shackling a defendant at sentencing). In all the cases in which shackling has been approved, there has also been evidence of disruptive courtroom behavior, attempts to escape from custody, assaults or attempted assaults while in custody, or a pattern of defiant behavior toward corrections officials and judicial authorities. *See, e.g., Morgan v. Bunnell,* 24 F.3d 49, 51 (9th Cir.1994); *Hamilton v. Vasquez,* 17 F.3d 1149, 1154–55 (9th Cir.1994); *United States v. Baker,* 10 F.3d at 1401; *King v. Rowland,* 977 F.2d 1354, 1358 (9th Cir.1992); *Jones v. Meyer,* 899 F.2d at 885; *Stewart v. Corbin,* 850 F.2d 492, 498 (9th Cir.1988); *Wilson v. McCarthy,* 770 F.2d at 1485. Here, the record does not indicate any of these factors existed.[7] We conclude, therefore, that the state trial court committed constitutional error by requiring Duckett to appear before the sentencing jury in physical restraints.

 The remaining question is whether this error prejudiced the outcome of the sentencing hearing. Shackling, except in extreme forms, is susceptible to harmless error analysis. *Castillo v. Stainer,* 997 F.2d at 669. Because this is a habeas case dealing with a state court sentence, the question is whether the shackling "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Brecht v.*

*Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993)). If we are in "grave doubt" whether the error affected the verdict, the error is not harmless. *O'Neal v. McAninch,* —— U.S. ——, ——, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995).

Duckett has not presented any evidence of prejudice. Moreover, despite the severity of his crime, the jury did not find him eligible for the death penalty but sentenced him instead to life without the possibility of parole.

 The risk of doubt, however, is on the state. *Id.* at ——, 115 S.Ct. at 996 (rejecting language in *Brecht v. Abrahamson* which places on defendant burden of showing prejudice). Because in this case the trial court summarily overruled Duckett's objection to the shackles, the record does not reflect how onerous the shackles were, or the extent to which they were visible to the jury. *See Castillo v. Stainer,* 983 F.2d at 149 (finding shackling at trial harmless error because defendant only wore waist chain that could not be seen by jury). Given the inadequacy of the record, we cannot conclude without "grave doubt" that, absent the error, the jury would not have sentenced Duckett to life *with* the possibility of parole, an option which was available to it. Therefore, we must remand to the district court for an evidentiary hearing on the issue of prejudice. *See Rhoden v. Rowland,* 10 F.3d at 1460 (remanding for evidentiary hearing where record not properly developed on issue of prejudice caused by shackling).

## CONCLUSION

 We hold Duckett's constitutional rights were violated when the state trial court required him to appear in shackles before the jury at his sentencing hearing.

---

7. The trial court is not required to state on the record all its reasons for imposing shackles, nor must it conduct an evidentiary hearing on the issue of necessity before ordering the use of physical restraints. *Jones v. Meyer,* 899 F.2d at 886; *see also Hellum v. Warden,* 28 F.3d 903, 907–08 (8th Cir.1994). *But see Elledge v. Dugger,* 823 F.2d at 1452 (Edmondson, J., concurring in part and dissenting in part) (describing majority's holding as creating "per se rule that requires a state trial judge to hold a hearing before shackling a defendant at the sentencing phase of a bifurcated trial"). However, the basis for the decision to shackle should be apparent from the record. *See Jones v. Meyer,* 899 F.2d at 886–87. If it is not, the case must be remanded for an evidentiary hearing to determine whether shackling was justified. *See Hamilton v. Vasquez,* 882 F.2d 1469, 1472–73 (9th Cir.1989) (remanding to district court with directions to review state court record and, if necessary, conduct evidentiary hearing to determine whether shackling was necessary).

We remand to the district court for an evidentiary hearing the question whether this error was harmless. We affirm the district court's rejection of all of Duckett's other claims.[8]

AFFIRMED in part and REMANDED for an evidentiary hearing on the shackling claim.

8. We reject as meritless Duckett's argument that the district court should have appointed counsel for him in his federal habeas proceeding. The right to counsel extends only through trial and the first appeal as of right. *McCleskey v. Zant*, 499 U.S. 467, 495, 111 S.Ct. 1454, 1470–71, 113 L.Ed.2d 517 (1991); *Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539 (1987); *Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir.1986), *cert. denied*, 481 U.S. 1023, 107 S.Ct. 1911, 95 L.Ed.2d 516 (1987). Nor did the district court abuse its discretion in declining to appoint counsel. *See Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir.1983).